892 So.2d 1238 (2005)
STATE of Louisiana
v.
Clarence HARRIS, Jr.
No. 2001-KA-2730.
Supreme Court of Louisiana.
January 19, 2005.
Rehearing Denied February 25, 2005.
*1242 Capital Appeal Project, Jelpi Pierre Picou, Jr., New Orleans, G. Benjamin Cohen, David Laurence Koen, Counsel for Applicant.
Charles C. Foti, Jr., Attorney General, Eddie J. Jordan, Jr., District Attorney, Valentin Michael Solino, Scott Douglas Peebles, Claire Adriana White, Assistant District Attorneys, Counsel for Respondent.
TRAYLOR, J.
On October 14, 1993, an Orleans Parish grand jury indicted the defendant, Clarence Harris, Jr., for the August 17, 1993 first degree murder of Katie Carlin. On September 19, 1997, the jury returned a unanimous verdict of guilty as charged. At the conclusion of the penalty phase, the jury unanimously returned the sentence of death, after unanimously finding three aggravating circumstances: (1) the defendant committed the murder while knowingly creating a risk of death or great bodily harm to more than one person; (2) the defendant was engaged in the perpetration or attempted perpetration of aggravated rape and/or aggravated kidnapping; and (3) the offense was committed in an especially heinous, atrocious or cruel manner. On direct appeal to this Court under La. Const. art. 5, § 5(D), the defendant appeals his conviction and death sentence on the basis of 69 assignments of error. Finding that none of the arguments put forth by the defendant constitute reversible error, we affirm the defendant's conviction and sentence.

FACTS
In the early morning hours of August 17, 1993, Katie Carlin was discovered by her husband and two of her three daughters lying in the middle of the street at the intersection of Jackson Avenue and South Liberty Street in New Orleans, Louisiana.
*1243 She had been shot two times, once in the right shoulder and once in the left side of her head. The wound to her head proved to be a lethal injury; she died two days later without recovering consciousness.
After police arrived on the scene, they discovered that Mrs. Carlin had been with her 11-year-old daughter, K.,[1] at the time of the shooting, but that K. was now missing. At approximately 5:20 a.m., Detective Paul Long was notified that the child was back at the Carlin residence. When he arrived there, Detective Long observed K. was noticeably shaken and had several brush burns on her legs.

K.'s Initial Account To Officer At Scene
Before being taken to the hospital, K. told Detective Long that while she and her mother were at a payphone at Jackson Avenue and Simon Bolivar, a small, blue four-door vehicle pulled up and a black man got out of the car. When her mother finished her telephone call, they began walking back to their residence on Jackson Avenue. She noticed that the man in the blue car was following them. When they got to the intersection of South Liberty Street and Jackson Avenue, the car pulled up next to them and the man grabbed her and tried to pull her into the car. K. remembered her mother running towards her when the man fired two or three shots.
K. told Detective Long that the man then dragged her into his vehicle and drove her to an apartment complex. Although she did not know on which street the apartment complex was located, K. described seeing a large Shell station and a large Auto Zone store on the way. Once inside an apartment within the apartment complex, the man told K. to go into the restroom and wash the blood off of her legs. When she came out of the restroom, the man forced her to disrobe and raped her.
K. was able to describe her assailant as a light-skinned black man who was five foot ten inches tall, weighing approximately 150 pounds, with a beard and a mustache. She also noted that the man had a tattoo of what appeared to be a skeleton on his left arm and that he was wearing a burgundy Polo type shirt and blue jeans.
At approximately 6 a.m. that morning, Detective Patrick Young, a member of the child abuse section of the New Orleans Police Department, was assigned to this case. Detective Young immediately went to the hospital to check on K.'s medical condition. Later that day, he interviewed her and she repeated her story to him, supplying even more details of her abduction and rape. In connection with this interview, Detective Young taped a statement from K. describing the events, the perpetrator, his vehicle and his apartment.

K.'s Detailed Account To Child Abuse Detective
K. again related how she had been waiting while her mother made telephone calls at a payphone. She described how the man, who had been following them in his car, pulled up and grabbed her around the elbow. She remembered her mother running toward them calling out, "no, my baby, my baby." Then the man hollered at her mother to get back or he would shoot her. Thereafter, K. heard two or three gunshots.
The man pulled K. into his car while it was moving, causing her to have brush burns on her legs and scraped toes. After pulling K. into the car, the man put his gun to her head and told her he would kill her if she moved. The man then made K. *1244 lie back in the seat of his car so that she could not see the route they were taking. He later placed a towel over her face, but she was able to see out of the towel and noticed a large Shell gas station and a Popeye's restaurant across the street from that station at the intersection of two large streets with medians in the middle of them. She also saw an Auto Zone store when they were traveling to the man's apartment and when they left it. K. also saw a big vacant lot with a silver chain link fence about a block from the Shell station and thought she was in the area of the Carrollton shopping center.
The man then pulled into a parking lot of an apartment complex and parked his vehicle. He pulled K. from the passenger's seat while still holding his gun. She attempted to escape, but the man caught her. He scuffled with her and put his hand over her mouth, threatening to kill her if she tried to run again. She bit his finger, but he did not bleed.
The man brought her through a black iron gate with a bar which had to be pulled to open and then up a flight of stairs to an apartment. K. described to Detective Young the configuration of the apartment buildings and configuration of the parking lot. She then described the configuration of the rooms in the apartment.
During the entire event, K. was able to observe several items in the apartment including a straw bowl of pink lipstick in the bathroom, pink and white bed sheets, the bed's headboard, two coffee tables, a living room table, two lamps, the refrigerator, and a blue telephone with a caller ID box. The apartment had light brown or beige carpeting throughout. She described the color of the apartment door as white[2] and remembered beige or tan colored wood, and not brick, on the outside of the apartment complex.[3]
She told the detective that once the man took her inside the apartment, he told her to go into the restroom to clean the blood off of her legs. When she came out of the restroom, the man made her remove her clothes and go upstairs. He followed her upstairs and undressed. He forced her to lie down on a bed in the bedroom. The man told K. that if she did not do what he said, he would beat her and kill her. The perpetrator then lay on top of her and placed his penis in her vagina. K. tried to get up and escape, but the man yelled at her and told her that if she moved, he would kill her and throw her body into the canal. He left the room briefly and returned with a bottle of Johnson's baby oil which he retrieved from the bathroom. He placed the oil on K.'s vaginal area, and again began moving on top of her. During the assault, K. cried and continually asked the man to stop. The man repeatedly told K. he would kill her if she did not do what he wanted. Eventually, the man removed his penis from her vagina and proceeded to rape her anally.[4]
*1245 After he finished, the man told K. to put on her clothes. When they were both dressed, K. asked whether he was going to kill her and the man told her that he was going to return her to her house. He made K. close her eyes and led her out of his apartment with a towel over her eyes. He asked K. if she knew his name and she replied that she did not. He asked her if she knew where she was and she said that she did not. He then told her she could open her eyes and she saw the Auto Zone sign. She also remembered seeing the Shell station on Earhart Boulevard. She asked him if they were near the Carrollton shopping area and he told her that he lived far away from the Carrollton area. K. remembered the man throwing bullets out of the window of his car as he drove. He then returned her to the area in which she was abducted.
K. stated that she started running after she was released. As she neared her home, a neighbor saw her and asked her where she was going. When she told the neighbor she was going home, the neighbor told her that no one was at her home and called the police. The neighbor told K. that her mother had been shot.
K. described the car she had been abducted in as a small, four-door, dark blue car. She remembered there were beaded mats on the driver and front seat passenger seats and that there were a lot of books and clothes in the back seat. She described the rear view mirror as not being attached to the windshield and the automatic shift being on the floor. She thought she remembered seeing the letters "S-A-A-B" or "S-A-B-B" on the back of the vehicle by the trunk.[5]
K. further described her assailant as between 6' and 5'8" tall,[6] with a medium bush hairstyle and a black-colored full beard. She remembered seeing a tattoo on his left arm near the shoulder when she had been laying down in bed trying to get up. She recalled that the tattoo looked like a skeleton head and some kind of banner with writing. She described the clothes he had been wearing as a striped burgundy polo shirt and blackish colored jeans. She described his shoes as being white Converse Allstars tennis shoes but stated he changed into slippers to drive her home. Her assailant had been wearing green boxer shorts and a white t-shirt under his polo shirt.
After obtaining this statement from K. and returning to the child abuse office, Detective Young and Lieutenant Teddy Daigle decided to ride around to see if they could recognize the area that K. described. When they left the police station they proceeded to the intersection of Carrollton Avenue and Earhart Boulevard where they noticed a large Shell gas station on the right side of the street and a Popeye's restaurant on the same side of *1246 the street, across Carrollton Avenue. Both streets have medians dividing them. They also noticed an Auto Zone nearby. They continued to canvass the area until they saw an apartment complex with black iron bars surrounding it.
The next day, Detective Young returned to the hospital to pick up K. and her father to have them ride with him to see if K. recognized any of the landmarks that she remembered from the night of the incident. When Detective Young reached the intersection of Earhart Boulevard and Carrollton Avenue, K. shouted, "that's the Shell station I saw right there." She recognized the Popeye's and the nearby Auto Zone store, as well. As Detective Young proceeded, K. continued to recognize the area. Eventually, the detective drove by the Carrollton Park Apartments. When they arrived at the complex, K. directed Detective Young to the parking lot where she pointed out the parking space where the perpetrator parked his vehicle.[7] She then pointed to an apartment door, stating that it was the apartment to which the perpetrator brought her.
At this point in his investigation, Detective Young contacted the apartment manager, Dori Kahn, to find out who resided in the apartment which K. pointed out to him. Ms. Kahn told the detective that the defendant, Clarence Harris, and his wife, Cheryl Harris, lived there. Based on this information, Detective Young obtained a photograph of Clarence Harris and arranged a photographic lineup for K. to view at the hospital. In the presence of Detectives Young and Cathy Carter, K. immediately identified the defendant as the man who kidnapped, raped and sodomized her.
Detective Young then secured an arrest warrant for the defendant and a search warrant for his apartment. The search warrant was executed first and the officers found several of the items described by K., including the pink and white bedsheets. Pictures were taken at the scene of other details of the apartment remembered by K., such as the configuration of the apartment, the blue telephone with the caller I.D., the headboard of the bed, the lamp beside the headboard and the placement of the window in the bedroom. In the bathroom, the police found the straw bowl of pink lipsticks and the bottle of Johnson's baby oil described by K.; these items were photographed and confiscated.
After he left the house, Detective Young learned that the defendant's wife was in the hospital and that the defendant might be there visiting her. Detective Young found Harris at the hospital and informed him that he was under arrest for the attempted murder of Katie Carlin, and the aggravated rape and aggravated kidnapping of K. After verbally informing the defendant of his rights, Detective Young asked Harris how he got to the hospital and if he owned a car. The defendant showed the officer where his small, blue four-door Toyota was parked. Detective Young noticed that the car had the beaded seats and papers in the back seat that K. described. Detective Young had the vehicle towed and a search was later performed on the car pursuant to a search warrant which yielded many items described by K. in her statement, including a pair of white Converse All Star tennis shoes worn by K.'s attacker. In addition, photographs were taken of the distinctive rearview mirror in the car which matched the description given by K. and of the automatic shift on the floor.
*1247 When Detective Young and Harris reached the child abuse office, the detective informed the defendant of his rights from the rights of arrestee form. Harris indicated that he understood his rights, waived them and made a statement to Detective Young. Harris told Detective Young that at the time of the crime, he was at the hospital with his wife and someone else must have used his car.[8] He then indicated that he wished to speak with his wife before he said anything else.
Detective Young then received a telephone call from the defendant's sister-in-law, Xanthippe Juluke. Mrs. Juluke told the detective that the defendant came to her home on the day of the shooting and told her that he had a gun which he needed her to hide because "they have a murder on this gun." The defendant explained to Mrs. Juluke that he had been giving two girls a ride home. He stated that one of the girls went upstairs and tried to rob him when she came back downstairs. Instead of pulling out his wallet, he pulled out a gun and shot the girl in the head. Upon hearing this story, Mrs. Juluke allowed the defendant to place the gun in her bathroom cabinet. However, she later contacted Detective Young and turned the gun over to him.
Detective Young had the weapon photographed and confiscated. The weapon fit K.'s description of the gun which the perpetrator has threatened her with; i.e. a black gun with brown grips that was approximately 6 or 7 inches long. In addition, the gun had a hidden hammer. The weapon contained two different types of .38 caliber bullets. Seven bullets were marked RP 38 special. The same type of bullet was found in the defendant's apartment.
After Katie Carlin's death, Detective Young re-booked the defendant on first degree murder charges and, after being advised of his rights, the defendant indicated that he understood his rights and wanted to make a statement to Detective Young. The defendant recounted that he was at the telephone at Jackson Avenue and Simon Bolivar when he saw a woman and a little girl also using the telephone. He left to get a beer and when he returned to the telephone he saw the woman and the little girl leave and walk towards their residence. When they left, he got into his vehicle. The defendant stated he did not know what route he took, but he stopped to urinate. When he finished, he started fixing his clothes, at which time he bumped into the woman or the girl and they started striking him. He said when he turned, he started struggling with the woman because she had a weapon.[9] While scuffling over the weapon he heard two gunshots and the woman fell and the gun was in his hand. He said while the gun was in his hand, the girl was punching him in his side and he turned around and hit her causing her to fall back into his vehicle. From there, he said he threw the gun into the car, fixed his clothes, got in the car and drove off. He stated that he had no idea what happened to the woman or the eleven-year-old girl.
Detective Young questioned the defendant further about the gun, which he had obtained from the defendant's sister-in-law, Mrs. Juluke. The defendant described *1248 the weapon as being a "funny made gun, black, brown handle and he said it was funny made because it didn't have a hammer to it." He also told the detective that he was an expert shot with a rifle, but not with a handgun.
On October 14, 1993, an Orleans Parish grand jury indicted the defendant for the first degree murder of Katie Carlin, a violation of La. R.S. 14:30. At trial, the state presented testimony from several witnesses, including K. The state also introduced into evidence, through Detective Young's testimony, the statements made by the defendant. However, the state was not able to introduce physical evidence which would have tended to tie the defendant directly to the case. The bullet recovered during the autopsy of Katie Carlin had been too damaged by its impact with the victim's skull for the state's firearms examiner to make a positive match to the weapon recovered from the defendant's sister-in-law, Mrs. Juluke. In addition, a swab containing sample fluids from a rape kit performed on K. was improperly preserved for use as evidence and precluded any attempt to recover a DNA specimen for purposes of identifying the defendant as her assailant.
The defense introduced the testimony of Dr. Laxman Kewalramani, who testified that he treated the defendant for injuries he sustained in a motor vehicle accident involving two tractor trailer trucks in February 1993. He provided the defendant with prescriptions for several medications that would ease the defendant's pain and headaches. According to the defense, the defendant would not have pulled K. into his car while it was moving due to his injuries and pain because doing so would increase his pain. The defense had John Jacobson, a forensic consultant, testify as to what blood evidence should have been found in the defendant's vehicle based on K.'s injuries and the procedures that he would have followed had he been in charge of the DNA evidence gleaned from the investigation in this case. Dr. Michael Murray also testified for the defense concerning the use of DNA evidence for human identification. The defense's main argument at the guilt phase was that the lack of DNA evidence and inconsistencies in K.'s statement and testimony gave rise to reasonable doubt of the defendant's guilt.
The jury subsequently found the defendant guilty of first degree murder. The following day, the trial court conducted the capital sentencing hearing. The state first reintroduced all of its evidence from the guilt phase. Next, the state called several witnesses including Katie Carlin's sister, Oranell Joubert, who testified as to the impact of Mrs. Carlin's death on her and her family.
K.F. and W.R. also testified that they were victims of the defendant's sexual abuse, including an attempted rape and molestation and an aggravated kidnaping and rape, respectively.
On August 29, 1993, the police showed W.R. a photographic lineup at her house. She picked out the defendant as the man who had abducted her and raped her two months earlier. In court, W.R. positively identified the defendant as the man who had abducted her on June 13, 1993. In addition, Supervisory Special Agent John Mertens of the FBI testified that the DNA from a vaginal swab of W.R. matched a blood sample of the defendant.[10]
*1249 K.F., the defendant's niece by marriage, testified that the defendant would put his finger in her vagina when she was approximately eight years old and told her that he was supposed to do that because he was her uncle. On March 6, 1992, when K.F. was eleven years old, her mother and aunt left her in the defendant's charge. K.F. testified that the defendant called her into her aunt's bedroom and told her to lay face down on the bed. When she had done so, the defendant started touching her in her vaginal area. K.F. testified that she did not know what the defendant was trying to put inside of her, but it would not go and she began to cry. The defendant stopped. As K.F. began to turn around, the defendant told her not to turn around and she heard him zip his pants. The defendant then told K.F. that she was his star, and the only reason he was doing this to her was so when boys did it she would not be surprised. K.F. told her mother and her school principal about the abuse. The principal called the police and the defendant was arrested. The case was not prosecuted because the district attorney's office could not contact the victim.
In addition to the testimony of its witnesses, the state introduced certified records of two prior convictions of the defendant's, one in 1980 for simple burglary and the other in 1981 for being a convicted felon in possession of a weapon.
The defense presented testimony from five witnesses in the penalty phase, including an expert in forensic psychology and several family members. The defense called Dr. Mark Zimmerman, an expert forensic psychologist, who testified that after the tractor trailer accident in February 1993, the defendant began to display unusual behavior. Dr. Zimmerman testified that there was a dysfunction in the defendant's brain which prevented him from controlling his impulses, although he would not call the problem an illness. Dr. Zimmerman testified that the defendant would function well in prison, since he needs a structured environment. Thereafter, the defense presented several of the defendant's family members, who asked the jury to spare the defendant's life and return a sentencing verdict of life imprisonment.
After deliberation, the jury returned with a sentencing verdict of death after finding all three of the aggravating circumstances advanced by the state. The trial court formally sentenced the defendant to death by lethal injection on May 26, 1998. The defendant now appeals his conviction and sentence to this Court urging 69 assignments of error.[11]

LAW AND DISCUSSION

Delayed Disclosure of Victim's Statement[12]
The defendant claims that the state secured a conviction and death sentence by the delayed disclosure of exculpatory information. Specifically, the defendant claims that the prosecution did not provide him with a copy of the supplemental police report authored by Detective Young until September 11, 1997 and the taped statement of K. until September 13, 1997. Jury selection commenced on September 15, 1997.
Defense counsel claims that there are discrepancies between K.'s taped statement and what was contained in Detective Young's report; additionally, the defense *1250 asserts that some of K.'s statements are exculpatory as to the defendant. This information was in the hands of the police hours after the crime, and was not disclosed until four days (or two days) before trial. The defense argues this delayed disclosure of exculpatory and impeachment evidence served as a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215(1963), and should have served as the basis for the court's granting of a requested seven day defense continuance of the trial.
Late disclosure as well as non-disclosure of evidence favorable to the defendant requires reversal if it has significantly impacted the defendant's opportunity to present the material effectively in its case and compromised the fundamental fairness of the trial. State v. Kemp, 2000-2228 pp. 7-9 (La.10/15/02), 828 So.2d 540, 545-546. The impact on the defense of the late disclosure "must be evaluated in the context of the entire record." Kemp, 00-2228 at p. 7, 828 So.2d at 545.
At the hearing on the defendant's motion for continuance held on September 15, 1997, the defense's oral motion for continuance was initially premised solely on the late disclosure of the taped statement of K.[13] The prosecutor stated he thought the tape had been lost, and once a copy was found, it was turned over to the defense.[14] The state admitted there might be some exculpatory information on the tape.[15]
The state additionally filed into the record a receipt of discovery provided to and signed by the defense on September 11, 1997.[16] Included in that discovery receipt is mention of the supplemental report authored by Detective Young. While the receipt is dated four days before trial, the state asserted at the hearing and in its brief to this court that most, if not all, of the material mentioned in the receipt had previously been provided to the defense.[17] The prosecutor stated at the continuance hearing that the purpose of the receipt was simply to document the discovery already conducted between the parties.[18]
At the hearing, the defense's reference to a police report disclosed on September 13, 1997 actually refers to the police report, also authored by Detective Young, concerning the arrest of the defendant in 1992 for the molestation of K.F.[19] When defense counsel re-urged its motion for continuance, he argued that the 1992 police report was relevant to the guilt phase of the present case under his theory that Detective Young had investigated both crimes and was targeting the defendant for this crime. The late disclosure of this evidence, the defense argued, was that there had not been sufficient time to investigate this link.
The trial court denied the defendant's motion for a continuance on both grounds. As for whether there was exculpatory or impeachment evidence contained in K.'s audio statement or whether there was a link between the police's investigation of the K.F. crime and the instant crime, the trial judge stated that the state would proceed at its peril.[20]
Evaluating the impact of the late disclosed evidence in the context of the entire record, it is clear that the defense presented the material effectively in its case. The *1251 record indicates that defense counsel conducted a thorough and well-prepared cross-examination of both Detective Young and K.
Defense counsel questioned Detective Young extensively as to why certain details were left out of his report of this case when K. specifically mentioned them in her statement.[21] In his brief to this court, the defendant lists several examples of what it considers to be exculpatory evidence that were revealed by the disclosure of K.'s statement, yet the record shows clearly that defense counsel was well prepared to address these discrepancies and questioned Detective Young extensively on these issues. Defense counsel asked the detective about (1) K.'s description of the perpetrator's tattoo in comparison to the defendant's tattoo;[22] (2) K.'s recollection of the letters on the perpetrator's vehicle as S-A-A-B or S-A-B-B when the defendant drove a Toyota Corolla; (3) K.'s description of the door to the perpetrator's apartment as white when the exterior door to the defendant's apartment was brown; (4) K's description of the perpetrator's apartment complex as having some sort of pale wood and no brick when the first floors, columns and end of buildings of the defendant's apartment was brick; (5) discrepancies in K.'s description of the perpetrator's vehicle; and (6) whether K. stated that the defendant was looking at her while her mother was on the telephone.[23] From this cross-examination it is clear that the alleged untimely disclosure of the police report and statement did not impair the defense's examination of Detective Young.
As for the alleged prejudice in preparing its defense in regard to K., there is no showing that any prejudice occurred. Defense counsel questioned K. about all of the descriptions she gave in her statement and any discrepancies between her taped statement and her direct testimony. He also questioned her extensively about the defendant's tattoo, her recollection of biting the perpetrator's finger, and her recollection of the letters on the perpetrator's vehicle.[24]
In addition to our own review of these matters, we also have the benefit of the trial judge's on-the-record comments regarding defense counsel's level of preparedness:[25]
In this case I have observed [defense counsel's] performance from the moment we had the attorneys final pre-trial conference on Monday morning up until now. I, as a prosecutor, have tried close to 300 jury trials in this building and as a Judge I have watched attorneys try numerous cases, numerous cases in the eleven months that I have been here. And in connection with my employment as assistant D.A., I have supervised and watched in practice attorneys try cases including capital cases in this building above and beyond the cases that I have tried myself and I must say that [defense counsel's] performance in this case *1252 was superfluous. That his level of preparation, in my opinion, was well beyond what is reasonably expected of an attorney. It was more along the lines of a level of preparation that left no stone unturned. I found [defense counsel] paid a great deal of attention to details in this case above and beyond a tape that you were provided with on Saturday night because the tape is one of probably hundreds of exhibits introduced by the state in this case. I found that his preparation of DNA expert [testimony] was thorough. That his questions were logical and well thought out and that he didn't just put his witnesses on the stand and shoot from the hip. He had done his homework on this DNA issue. However, in this case you did not win your case, [defense counsel] but the reason the verdict was other than the one you were hoping for was not because you or [defense co-counsel] were ineffective.
It is not because[,] and in the opinion of this court[,] your performance fell below a standard of reasonableness. If I would have to compare your level of performance preparation to the performance of other attorneys that I have seen in similar cases in this building, I would say your performance was superlative but that does not guarantee that a defendant will get the verdict that he is hoping for.
Therefore, up to this point I find no deficiencies in counsel's performance. It's far from that.[26]
Consequently, counsel fails to persuade this Court that the late disclosure of the statement and audiotape, used extensively on cross-examination of Detective Young and K., impacted the fundamental fairness of the proceedings and undermined confidence in the jury's verdict. The defendant makes no showing that the late disclosure deprived the jury of the opportunity to consider all of the factors related to K.'s statement to Detective Young. In addition to intensely cross-examining K. and Detective Young, defense trial counsel exploited the absence of ballistics and DNA evidence that would have conclusively proved the defendant's guilt or innocence.
As found by the trial judge, defense trial counsel made full and powerful use of Detective Young's police reports and K.'s taped statement. The defendant's claim in brief of the failure of trial preparation and of actual innocence is completely unpersuasive given the amount and quality of the detail of K.'s memory of the crime; the corroboration of that detail by the search warrant returns of the defendant's apartment and automobile; the medical evidence confirming the rape; the pre-trial identification of the defendant made by K. the day after the crime occurred; the fact that the crime committed permitted K. unimpeded observation of the defendant under the most intimate of circumstances; the trial identification of the defendant made by K.; and her articulate and compelling trial testimony. The state's evidence was additionally bolstered by the defendant's various statements attempting to explain away his murder of Katie Carlin. The record is clear that the state's late disclosure of the cited evidence did not prevent the defendant from presenting his defense.
We likewise find the trial judge did not err in denying the defense motion for a seven-day continuance based on the untimely disclosure of the above mentioned evidence. The decision whether to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb a district judge's determination absent *1253 a clear abuse of discretion. La.C.Cr.P. art. 712;[27]see State v. Strickland, 94-0025 p. 23 (La.11/1/96), 683 So.2d 218, 229. Even when an abuse of discretion is shown, this Court typically declines to reverse a conviction based on denial of a continuance absent a showing of specific prejudice. Id.
In the instant case, the jury heard the testimony of K. and Detective Young during both direct and cross-examination. On cross-examination, defense counsel thoroughly questioned the witnesses using both K.'s audio taped statement and Detective Young's report in an attempt to impeach them.[28] It is clear from the record that a continuance was not necessary in order to give the defense more time to develop its defense. Accordingly, the defendant has failed to demonstrate that he was prejudiced by the trial court's denial of his motion for continuance. These assignments of error lack merit.

Destruction of DNA Evidence[29]
The defendant raises several alleged errors concerning the destruction of the DNA evidence, consisting of semen collected from K. after the rape and seminal fluid on the defendant's seized bed sheet, which violated his rights to due process, a fair trial, and a reliable sentencing. He further states that this error was compounded by the trial court's refusal to instruct the jury on the impact of the state's destruction of the evidence.
An appellant is not deprived of his due process rights based on the state's failure to preserve potentially exculpatory evidentiary material unless bad faith is demonstrated. Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988) (absent a showing of bad faith, "failure to preserve potentially useful evidence does not constitute a denial of due process of law."); State v. Lindsey, 543 So.2d 886, 891 (La.1989).
Here, the defendant's argument raises no due process concerns. The defendant acknowledges that the rape kit of K. was destroyed after the container leaked and the sample became contaminated. During trial, the defense stipulated with the state that if the appropriate personnel from the forensic laboratory were called to testify, that person would testify that the container containing the vaginal swab from the rape kit of K. leaked and the evidence was destroyed.[30] The defendant, thus, presents no evidence of bad faith on the part of the prosecution and, consequently, no due process rights are implicated.[31]
The defendant further claims that the trial court erred in denying his request for a permissive instruction regarding the impact of the state's destruction of evidence.[32] The defendant has *1254 waived review of this claim, having failed to object to the trial judge's jury charges.[33]See La.C.Cr.P. art. 841(A) ("An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."); State v. Taylor, 93-2201 p. 7 (La.2/28/96), 669 So.2d 364, 369, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996) ("This Court's scope of review in capital cases will be limited to alleged errors occurring during the guilt phase that are contemporaneously objected to, and alleged errors occurring during the sentencing phase, whether objected to or not.").[34] Even so, there was no abuse in the trial judge's discretion under La.C.Cr.P. art. 807[35] in denying the defendant's proposed charge. The defendant's proposed instruction was not a wholly correct statement of law or pertinent, as no presumptions arise from the state's destruction of evidence in the absence of a showing of bad faith.
The defendant further claims that the state should not have been allowed to introduce evidence concerning the missing DNA evidence. John Palm, Jr., a criminalist for the New Orleans Police Department testified as an expert for the state in the analysis of bodily fluids. Officer Palm's testimony indicated that he tested several items of evidence for the presence of seminal fluids and obtained positive results on the victim's panties, the victim's shorts and one of the defendant's bed sheets. However, Officer Palm did not further test the evidence to determine the blood type from the seminal fluid and did not take any special precautions to preserve the samples for DNA testing, a science in its nascent stages in 1993.[36] Officer Palm's testimony did not address DNA testing or the destruction of evidence. In fact, Officer Palm testified that he did not have anything to do with the packaging of any items for DNA testing.[37]
Evidence regarding the presence of seminal fluid on eleven year old K.'s panties and shorts was evidence of a sexual assault. K. identified the defendant as the perpetrator of that assault. She also led the police to the defendant's apartment and identified the bed sheets where she was raped. Evidence regarding the presence of seminal fluid on those sheets, and on K.'s panties and shorts, has probative *1255 value and were properly admitted. This testimony was properly before the jury.
Finally, the defendant asserts that the prosecutor's closing argument in the guilt phase regarding the defense's lack of testing of the DNA evidence was highly improper. La.C.Cr.P. art. 774 provides that closing arguments in criminal cases should be restricted to the evidence admitted, to the lack of evidence, to conclusions of fact that may be drawn therefrom and to the law applicable to the case. The defendant failed to preserve this alleged error for review by failing to object to the state's guilt phase closing argument. La.C.Cr.P. art. 841; Taylor, 93-2201 p. 7, 669 So.2d at 369.
Even so, the law is clear that prosecutors are allowed considerable latitude in choosing closing argument tactics. The trial judge has broad discretion in controlling the scope of closing argument. State v. Prestridge, 399 So.2d 564, 580 (La.1981). Even if the prosecutor exceeds these bounds, the Court will not reverse a conviction unless "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. Taylor, 93-2201 p. 19, 669 So.2d at 375.
The defendant complains about a portion of the prosecutor's closing argument that referred to the defense's failure to test the evidence for DNA itself. A review of the record shows that the prosecutor's argument in context was a rebuttal to the argument presented by the defense, accusing the state of deliberately destroying the evidence.[38] Insofar as the state was pointing out the theoretical availability of evidence to both sides for testing, not present in this case, the argument was not improper. See State v. Manning, XXXX-XXXX pp. 74-75 (La.10/19/04), 885 So.2d 1044, 1107-1108.

Penalty Phase Closing Argument[39]
The defendant asserts that during penalty phase closing arguments, the state improperly directed the jury's attention to a "sea of people" in the audience affected *1256 by "what he did" and then told the jury that those people wanted the defendant to receive the death penalty. Specifically, the state's penalty phase closing argument began with the prosecutor telling the jurors the information they should consider in their deliberations. The prosecutor then highlighted the testimony the jury just heard regarding the defendant's sexual assaults of W.R. and K.F. The prosecutor then invited the family members of all the persons affected by the defendants' actions to stand as follows:
THE STATE:
... All the members of the [C.] and [D.] family, could you please stand up and all the members of the [F.] family could you please stand up?
THE DEFENSE:
Your honor, I object to that.
THE COURT:
Overruled.
THE STATE:
[W.R.], would you please stand up? There's a sea of people out there. A sea of people out there. A sea of people affected by what he did. Yawl can sit down.[40]
After the prosecutor concluded her remarks, defense counsel made his closing argument. Thereafter, another prosecutor began the state's rebuttal closing argument by addressing the defense's request that the jury give the defendant's victims closure. The prosecutor responded to that specific argument with the following:
Ladies and gentlemen, you saw the victims we put on today. You saw the victims we put on this week. That was tough on those victims. Those victims came in here and you didn't see any of them try to break away, you didn't see [any] of them leave. They wanted to be here. They wanted to have their say in front of you. They want closure all right. They want that man to receive a sentence of death. That's their closure. That's why they're out there.[41]
No objection was raised to this argument by the defense. Although the lack of an objection does not preclude review of this allegation of error under the review standards applicable to this case, the lack of objection does provide some evidence that the remark was not considered improper at the time it was given by defense counsel at trial.
As previously stated, a prosecutor has wide latitude in making closing arguments. Taylor, 93-2201 p. 19, 669 So.2d at 374; State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, 1285, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996). This latitude is not, however, without boundaries. We have repeatedly "warned prosecutors they are not to turn closing arguments into a plebiscite on crime." State v. Eaton, 524 So.2d 1194, 1208 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989). However, "even when we have found that a prosecutor has exceeded that latitude, the Court has often criticized the improper arguments without finding that they constitute reversible error." Taylor, 93-2201 p. 19, 669 So.2d at 374. Before a reviewing court will hold that an improper argument rises to the level of reversible error, that court "must be thoroughly convinced the remark influenced the jury and contributed to its verdict." Eaton, 524 So.2d at 1208.
Here, we find the prosecutor's plea to the audience members whose families were victims of the defendant was improper. However, we do not find that the action influenced the jury or contributed to its verdict. Likewise, the other prosecutor's *1257 remark regarding closure does not rise to the level of reversible error. The brief remark regarding the victims' possible preference for the sentencing verdict,[42] would not have come as a surprise to the jurors. Taylor, 93-2201 p. 12, 669 So.2d at 371 ("That the victim's survivors [or other victims] might have little or no sympathy for the defendant certainly would come as no surprise to a member of the jury."). Moreover, the jurors were instructed that they were to "consider the circumstances of the offense and the character and propensities of the defendant in determining the sentence to be imposed."[43]
While we find the prosecutors' actions did not rise to the level of reversible error, we caution that this ruling is not to be interpreted as approval of this type of argument. Considering the brevity of the statements, reviewing the statements in the context of the entire argument, the lack of contemporaneous objection and the evidence presented by the state at the penalty phase, we are not firmly convinced that the jury was influenced by the statements and that they contributed to the verdict, especially "[i]n light of the deference given to the good sense and fairmindedness of juries." Taylor, 93-2201 at p. 21, 669 So.2d at 375.

CAPITAL SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La.S.Ct.R. 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the trial court has submitted a Uniform Capital Sentence Report ("UCSR"), and the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation ("CSI").
The CSI indicates that the defendant is a black man who was born on March 6, 1962, to Clarence Harris, Sr. and Veronica Harris. His parents separated in the mid 1960's. He has six sisters and one brother. The defendant was raised as a Catholic, but is no longer practicing.
The defendant completed the 11th grade at Central High School in Denver, Colorado. He claims that he left school to help his mother in New Orleans. He attended Delta College for two to three months where he took accounting classes and learned truck driving when he worked for Ryder Truck Company. He also learned carpentry from his father. The defendant quit his truck driving job in February 1993 when he was injured and since that time he has been receiving disability payments.
According to the CSI, the defendant married his wife, Cheryl, in April of 1987. She died in November 1993 as a result of liver cancer. The defendant also has one daughter.
The defendant denies ever having used any type of illegal drugs and claims that he has never been treated for mental illness. However, the report indicates the defendant attempted suicide in jail in 1993 when he learned of his wife's death. The author of the CSI made numerous attempts to speak with the defendant's father to verify *1258 the information given to him by the defendant, but his calls were not returned.
As to the defendant's criminal history, the CSI indicates a prior conviction for simple burglary in March 1997[44] and one for felon in possession of a firearm in May of 1980. In May 1981, the defendant was arrested for armed robbery, aggravated battery, simple kidnapping, and false impersonation of a police officer; all of these charges were refused. In January 1990, the defendant was arrested for aggravated assault and being a felon in possession of a firearm. In May 1991, the defendant was again arrested for being a felon in possession of a firearm. In April 1992, the defendant was arrested for indecent behavior with a juvenile and molestation of a juvenile (the K.F.). In August 1993, the instant case, the defendant was arrested for aggravated rape of a victim under 12(K.), aggravated kidnapping (K.) and attempted first degree murder (of Katie Carlin); he was later re-arrested for first degree murder after Katie Carlin's death. In connection with this crime, the defendant was also initially charged with aggravated kidnapping, aggravated crime against nature, aggravated rape, crime against nature and second degree kidnapping.
Since the defendant's arrest and incarceration, he has been charged with many disciplinary violations. In February 1995, he was accused of smoking intoxicants and conduct which disrupts the security of the prison. In July 1996, the defendant was accused of adulteration of food and drink, rioting, engaging in or encouraging a group demonstration, conduct which disrupts the security of the prison and being unsanitary or untidy. In October 1996, the defendant was accused of lying or providing a false statement to a staff member. In May of 1997, he was accused of destroying or damaging property and conduct which destroys the security of the prison. Finally, in August 1997, the defendant was accused of refusing to obey an order of a staff member.
The first degree murder victim was 40 year old black woman. The defendant and this victim did not know each other prior to the murder. The rape and kidnapping victim was an eleven year old black girl. The defendant and this victim did not know each other prior to the kidnapping and rape.

Passion, Prejudice, or Any Other Arbitrary Factors
Although the defendant claims the capital sentence was imposed under passion, prejudice and arbitrary factors in a variety of arguments, this court has found there is no evidence that passion, prejudice, or any arbitrary factors influenced the jury in its recommendation of the death sentence.

Aggravating Circumstances
At trial, the state argued that the following aggravating circumstances existed: (1) that the offender was engaged in the perpetration or attempted perpetration of an aggravated kidnapping and/or an aggravated rape; (2) that the offender knowingly created a risk of death or great bodily harm to more than one person; and (3) that the offense was committed in an especially heinous or atrocious, or cruel manner. La.C.Cr.P. art. 905.4(A)(1), (4), (7). The jury found the existence of each of the aggravating circumstances urged by the state.[45]
Accepting the defendant's claim that the evidence failed to support that the murder was "committed in an especially heinous, atrocious, or cruel manner" *1259 as that circumstance is currently understood under Louisiana law,[46] the inclusion of this aggravating circumstance did not interject an arbitrary factor into these proceedings. This Court has held on numerous occasions that the failure of one or more statutory aggravating circumstance does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. State v. Bowie, 00-3344 p. 28 (La.4/3/02), 813 So.2d 377, 395-396, cert. denied, 537 U.S. 951, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002) (citing Wessinger, 98-1234 p. 16, 736 So.2d at 192; State v. Letulier, 97-1360 p. (La.7/8/98), 750 So.2d 784, 799). Evidence of the invalid aggravating circumstance in this case did not interject an arbitrary factor into the proceedings because evidence of the crime, including the defendant's conduct, the victims' injuries, and the circumstances leading up to and following the murder was relevant and properly admitted at trial. Further, the remaining aggravating circumstances were amply supported. Hence, no arbitrary factors were interjected into the proceedings. See State v. Roy, 95-0638 p. 20 (La.10/4/96), 681 So.2d 1230, 1242, cert. denied, 520 U.S. 1188, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997).

Proportionality
There is no federal constitutional requirement to conduct a proportionality review. See Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991). This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender.
The state's Capital Sentence Review Memorandum reveals that since 1976 jurors in Orleans Parish have recommended that the death penalty be imposed against 36 defendants. However, of the 36 capital cases, 23 ultimately became "decapitalized" as the result of direct review in this Court or in the United States Supreme Court, post-conviction proceedings in the district court, or by executive action of the Governor's office.[47] In addition, one case *1260 remains pending in the district court on remand from this Court following conditional affirmance of the defendant's conviction and sentence.[48] In the remaining reduced pool of cases, none is remotely comparable to the present case, in which the victim of the aggravated kidnapping and rape was not also the victim of the murder. In fact, there is only one other case which involves kidnapping and rape in the available pool for comparison. State v. Rault, 445 So.2d 1203 (La.1984), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984)(victim kidnapped and raped, then shot to death).
On a state-wide review of similar cases, this Court has previously noted that juries throughout Louisiana often return death sentences in cases in which the defendant killed the victim in the course of an aggravated rape or an aggravated kidnapping, or in which he created a risk of death or great bodily harm to more than one person when he killed the victim. See State v. Snyder, 98-1078 p. 43 (La.4/14/99), 750 So.2d 832, 863, pet. for cert. filed 9/22/04 ("Cases are legion in which this court has affirmed capital sentences based primarily on the jury's finding that the defendant created the risk of death or great bodily harm to more than one person.")(collecting cases); State v. Thibodeaux, 98-1673 p. 31 (La.9/8/99), 750 So.2d 916, 939, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000) ("Cases are legion in which this court has affirmed capital sentences based primarily on the jury's finding that the defendant killed during the perpetration or attempted perpetration of an aggravated rape.")(collecting cases); State v. Louviere, 2000-2085 p. 35-36 (La.9/4/02), 833 So.2d 885, 908-909, cert. denied, 540 U.S. 828, 124 S.Ct. 56, 157 L.Ed.2d 52 (2003) (capital sentence not disproportionate where one person killed and multiple kidnappings and multiple rapes of other victims formed circumstances of crime); and State v. Wille, 559 So.2d 1321, 1342 (La.1990) (capital sentence not disproportionate where aggravated kidnapping formed circumstance of crime which allowed perpetrator to commit aggravated rape on murder victim) (collecting cases), 559 So.2d at 1342 fn. 17.
Moreover, like the three most recently executed capital defendants convicted in the Orleans Criminal District Court,[49] the defendant in the present case has a significant criminal history, including five prior arrests and felony convictions for burglary and possession of a firearm by a convicted felon. In addition, witnesses at the penalty phase testified about the defendant's *1261 history of sexual abuse of young victims, including kidnapping to obtain the opportunity to do so, which formed the basis of the crime committed here.
Against this background, the death penalty as applied to this defendant is not disproportionate considering the offender and the offense.

DECREE
For the reasons assigned herein, the defendant's conviction and sentence of death are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any State post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts.
AFFIRMED.
NOTES
[1] In order to preserve the privacy of this young victim, and others mentioned in this opinion, we will only use their initials.
[2] Pictures introduced in evidence and testimony of the apartment manager reflect that the outside of the apartment door is brown; however, the inside of the door is white and K. testified that it was the inside color of the door that she was referring to in her statement.
[3] At trial, the apartment manager confirmed that the apartment complex was enclosed in wood corrugated siding that was a very light, pale pink color. The brick on the complex was confined to the ends of the buildings facing the street, the exterior and the columns. Pictures of the complex reflect that the second floor apartments are covered in the wood siding. K. testified the perpetrator made her cover her eyes while approaching and leaving the apartment.
[4] At trial, the parties stipulated that Dr. Scott Benton was an expert in the field of medicine with a specific field of expertise in child sexual abuse. Dr. Benton testified that K. suffered one acute, blunt, penetrating trauma to her vagina. Lacerations could be seen on examination of her vaginal area. Moreover, semen was found to be present by the examining doctor which was a result of sexual assault.
[5] At trial, testimony and pictures confirmed that the defendant's vehicle was a small, four-door dark blue Toyota with beaded mats on the driver and front passenger seats. The rearview mirror was attached to the roof of the car, and not to the windshield and the automatic shift was on the floorboard. In addition, the back seat of the vehicle was filled with books and clothes; white Converse Allstars tennis shoes were found behind the driver's seat. The license plate on the vehicle was ABF 302.
[6] The difference in K.'s description of the perpetrator's height on the recorded statement has to do with how the question was asked. Detective Young asked if the perpetrator was as tall as he was (6' tall) and K. responded that he was shorter. When Detective Young asked if the perpetrator was as tall as another officer in the room (who was 5'8" tall), K. responded that the perpetrator was about that height.
[7] At trial, the apartment manager confirmed that the defendant and his wife used the parking space identified by K.
[8] At trial, Vivian Liquor testified that she was a nurse at the hospital where the defendant's wife was hospitalized during August of 1993. She testified that from 10:45 p.m. on August 16, 1993 until approximately 7:30 a.m. on August 17, 1993, she was responsible for administering medications to Cheryl Harris, the defendant's wife. Except for a co-worker at the hospital, Ms. Liquor did not observe any one, including the defendant, in Mrs. Harris' room during that time period.
[9] At trial, Mrs. Carlin's daughter, S.C., testified that her mother did not carry a gun.
[10] The DNA report and testimony was to the effect that the chance of going out into the population and selecting at random another individual who would have the same DNA profiles as the defendant's was approximately 1 in 500 million. Vol. 2, p. 255; Vol. 9, p. 1604.
[11] Three arguments were presented by defense counsel at oral argument to this court and will be discussed in the main body of this opinion. The other assignments of error are governed by clearly established principles of law and will be reviewed in an unpublished appendix which will comprise part of the record in this case.
[12] Assignments of Error Nos. 1-7.
[13] Vol. 6, p. 838.
[14] Vol. 6, p. 840-841.
[15] Vol. 6, p. 841.
[16] Vol. 2, 175; Vol. 6, p. 842.
[17] State's Brief, p. 17; see also Vol. 6, p. 842.
[18] Vol. 6, p. 842.
[19] See Vol. 6, p. 841; Vol. 1, p. 118.
[20] Vol. 6, p. 849.
[21] See ex. Vol. 11, p. 1974-2019.
[22] Although the record contains no picture of the defendant's actual tattoo, it is clear that the defense's argument was that the defendant's tattoo of writing alone did not resemble a skeleton with a banner and writing. However, the defendant was asked to exhibit his tattoo to the jury in court and the jury could consider K.'s testimony in conjunction with their viewing of the defendant's tattoo.
[23] See ex. Vol. 7, p. 1219-1246; Vol. 11, p. 1974-2063.
[24] See ex. Vol. 8, p. 1310-1364.
[25] After the conclusion of the guilt phase, and the jury's verdict that the defendant was guilty of first degree murder, defense trial counsel sought a mistrial as to the penalty phase on the issue of counsel ineffectiveness. Vol. 9, p. 1496.
[26] Vol. 9, p. 1497-1498.
[27] La. C. Cr. P. art. 712 provides: "A motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor."
[28] See Vol. 7, p. 1219-1237; Vol. 8, p. 1310-1366.
[29] Assignments of Error Nos. 13-17.
[30] Vol. 8, p. 1444-1445.
[31] The defendant additionally complains that the destruction of the DNA evidence prevented the defense from testing it. While that statement is true, there was no bad faith alleged on the part of the state in the evidence's destruction. Moreover, the destruction of the DNA samples allowed defense counsel to criticize the police's investigation of the crime and cast doubt on the police's handling of the entire case.
[32] The defendant proposed the following instruction:

The loss and or destruction of crucial physical evidence, especially physical evidence which is potentially favorable to the citizen accused of a crime by the state [,] evidence which the state had a duty to maintain custody of[,] is inexcusable.
There is a presumption that a party who destroys evidence was aware this physical evidence was potentially adverse to his case.
The application of this presumption is particularly appropriate where the state destroys and/or loses evidence potentially favorable to the accused.
Where the state could have determined decisively the guilt or innocence of a defendant, yet elects to prosecute on the basis of imperfect evidence [,] the state's evidence should be checked by this presumption. Vol. 2, p. 192-193.
[33] Vol. 9, p. 1521-1522.
[34] In State v. Wessinger, 98-1234 p. 20 (La.5/28/99), 736 So.2d 162, 181, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999), this court extended to the penalty phase the necessity of a contemporaneous objection to preserve an error for review. The court made its ruling in Wessinger prospective only. Therefore, this 1997 trial was pre-Wessinger and the court will review even unobjected-to penalty phase allegations of error.
[35] La.C.Cr.P. art. 807 provides:

The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
[36] Vol. 7, p. 1121-1124.
[37] Vol. 7, p. 1125.
[38] A portion of the prosecutor's closing argument in the guilt phase is as follows. The objected-to portion is in bold:

Ladies and gentlemen, let me  let me just go through the defense case for a minute. The defense talked to you about DNA. They wrote it on their board. They said that equaled not guilty. We don't have it, therefore, you should ignore all the other evidence and let him go. Ladies and gentlemen, the defense at length spoke to you about someone running around with the DNA samples, the swab. Spoke to you about how that swab could have been lost. Spoke to you about all the problems that they extracted, that they thought out, that they made up because of that swab. Ladies and gentlemen, what amazes me about that argument is that they stipulated, that means they agreed, they verified, they testified to the truth of the fact that unfortunately the packing leaked and the thing was destroyed. I'd love to be able to give you DNA. You may see DNA in another case sometime later this month. Another prosecutor will probably stand here and tell you that it should be believed. And I'm not gonna tell you it shouldn't be, I'm not gonna tell you there's anything wrong with DNA. But I'm telling you we don't have it in this case because as the defendant's team of attorneys and the prosecution agreed, it was lost. We couldn't use it. As to the rest of the stuff he was saying, well it was lost. Well, I tend to disagree with that. I heard the Officer say he had to look for it. He said he was never asked to look for it. He said he put [it] in the refrigerator and that's the last he saw of it. The defense said they'd love to have it. They sat there on the stand and they said they'd love to have it because they could have it tested. Well you heard from the criminalist, you heard from Officer Palm nobody asked to have that tested. Nobody asked him to look for it including them, until that day in court. As for lost, I couldn't tell you. Vol. 10, p. 1761-1762.
[39] Assignments of Error Nos. 40-41.
[40] Vol. 9, p. 1680-1681.
[41] Vol. 9, p. 1700.
[42] Although all of the defendant's family members urged the jury to sentence the defendant to life imprisonment, none of the victims testified as to their sentencing preference; nor, indeed, would that testimony have been proper. See Taylor, 93-2201 p. 11, 669 So.2d at 371.
[43] Vol. 9, p. 1526.
[44] He was arrested for possession of stolen property in March 1997, but the case was refused.
[45] Vol. 1, p. 105.
[46] For a crime to have been committed in an especially heinous or cruel manner, the evidence must support a finding of torture or pitiless infliction of unnecessary pain. State v. Hoffman, 98-3118 p. 33-34 (La.4/11/00), 768 So.2d 542, 574, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000); State v. Hamilton, 92-1919 p. 14-15 (La.9/5/96), 681 So.2d 1217, 1226, cert. denied, 520 U.S. 1216, 117 S.Ct. 1705, 137 L.Ed.2d 830 (1997); State v. Eaton, 524 So.2d 1194, 1210-1211 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989); State v. Brogdon, 457 So.2d 616, 631 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985). Torture "requires evidence of serious physical abuse of the victim before death." State v. Sonnier, 379 So.2d 1336, 1361-1362 (La.1979).
[47] See State v. Parker, 372 So.2d 1037 (La.1979)(rev'd)(life); State v. Culberth, 390 So.2d 847 (La.1980)(rev'd)(life); State v. Monroe, 397 So.2d 1258 (La.1981)(aff'd)(commuted to life by Governor); State v. Marshall, 414 So.2d 684 (La.1982)(rev'd)(life); State v. Brown, 414 So.2d 689 (La.1982)(rev'd)(life); State v. Jordan, 420 So.2d 420 (La.1982)(rev'd)(life); State v. Hamilton, 478 So.2d 123 (La.1985)(rev'd)(life); State v. Williams, 480 So.2d 721 (La.1985)(rev'd)(life); State v. Kyles, 513 So.2d 265 (La.1987) rev'd Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)(nolle prosequi); State v. Sullivan, 596 So.2d 177 (La.1992)(rev'd)(life); State v. Martin, 550 So.2d 568 (La.1989)(rev'd)(life); State v. Messiah, 538 So.2d 175 (La.1988)(aff'd), new penalty phase order by district court, review denied, 95-0262 (La.4/26/96), 672 So.2d 680 (life); State v. Scire, 600 So.2d 1319 (La.1992)(rev'd)(life); State v. Smith, 600 So.2d 1319 (La.1992)(rev'd)(acquitted); State v. Johnson, 541 So.2d 818 (La.1989)(rev'd)(life); State v. Smith, 554 So.2d 676 (La.1989)(rev'd)(manslaughter); State ex rel. Cage v. Whitley, 95-0863 (La.2/9/96), 667 So.2d 519 (rev'd)(on remand from United States Supreme Court in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1991))(life); State v. Brooks, 92-3331 (La.1/17/95), 648 So.2d 366(rev'd)(life); State v. Hall, 92-0362 (La.4/12/93), 616 So.2d 664 (rev'd)(manslaughter); State v. Landry, 97-0499 (La.6/29/99), 751 So.2d 214 (rev'd)(life); State v. Cousin, 96-2973 (La.4/14/98), 710 So.2d 1065 (rev'd)(nolle prosequi); State v. Bright, 98-0398 (La.4/11/00), 776 So.2d 1134 (rev'd)(life); State v. Thompson, 516 So.2d 349 (La.1987)(aff'd), rev'd post-conviction, 02-0361 (La.App. 4th Cir.7/17/02), 825 So.2d 552, writ denied, 02-2203 (La.11/15/02), 829 So.2d 427 (acquitted).
[48] State v. Frank, 99-0553 (La.1/17/01), 803 So.2d 1.
[49] The three most recently executed defendants are Thomas Ward, see State v. Ward, 483 So.2d 578 (La.1986), Antonio James, see State v. James, 431 So.2d 399 (La.1983), cert. denied, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983) and John Brown, Jr., see State v. Brown, 514 So.2d 99 (La.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988).