STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

KA05-637


STATE OF LOUISIANA

VERSUS

PAUL JUNIUS FELIX


************
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. 100,826
HONORABLE KRISTIAN DENNIS EARLES, DISTRICT JUDGE

************

JAMES T. GENOVESE
JUDGE

************

Court composed of Sylvia R. Cooks, Michael G. Sullivan, and James T. Genovese,
Judges.


**AFFIRMED.**


W. Jarred Franklin
Louisiana Appellate Project
3001 Old Minden Road
Bossier City, Louisiana 71112
**COUNSEL FOR DEFENDANT/APPELLANT**:
        Paul Junius Felix

Michele S. Billeaud
P.O. Box 3306
Lafayette, Louisiana 70502
**COUNSEL FOR PLAINTIFF/APPELLEE**:
        State of Louisiana

**GENOVESE, Judge.**

On November 6, 2003, the State filed a bill of indictment under docket number 100,826 charging Defendant, Paul Junius Felix, with one count of forcible rape, in violation of La.R.S. 14:42.1, and one count of aggravated incest with the same victim, in violation of La.R.S. 14:78.1. On November 18, 2003, Defendant pled not guilty to both charges.

Following a bench trial conducted on June 21-22, 2004, the trial court found Defendant guilty of both charges. On October 11, 2004, the trial court sentenced Defendant to forty years at hard labor. On March 14, 2005, under docket number 103,337, the trial court found Defendant to be a habitual offender, vacated Defendant's forty-year sentence, and resentenced Defendant to fifty years at hard labor without benefit of probation, parole, or suspension of sentence.

Defendant now appeals and assigns errors contesting his convictions, his sentence, and his adjudication as a habitual offender. We affirm Defendant's convictions, find the sentencing issues to be moot, and dismiss the assignment of error concerning the habitual offender adjudication as improperly before this court.

## FACTS

Defendant married CG's[1] mother on February 3, 1990, when CG was a young child. CG testified that Defendant began to abuse her when she was seven years old when she and her family were living in Youngsville, Louisiana. At trial, CG gave details of ten separate offenses that took place in or around Lafayette Parish, Louisiana.

---

[1] In accordance with La.R.S. 46:1844(W), initials are used to protect the identity of the victim.

OFFENSE NO. 1:[2]

CG testified that she first recalled an occasion when Defendant picked her up from a friend's house. When they arrived at their home, no one else was there. Defendant instructed CG to disrobe and lay on the bed, saying that he just wanted to look at her body parts. When CG cried and asked Defendant why, Defendant told her to be quiet.

*First Time Reporting the Abuse:*

Defendant went away sometime after the abuse started, and CG told her mother that Defendant had played with her several times by placing his penis in her vagina.[3] CG's mother took her to make a report; however, CG became frightened during the interview and refused to speak to the policeman who was asking her questions. At that time, the police informed CG's mother that they could not do anything about the abuse because CG would not cooperate.

OFFENSE NO. 2:

When Defendant returned, he lived with his sister, Eva Dell Onezine, and her family on California Street in Lafayette, Louisiana. CG, who was then eleven years old, and her mother also moved in with the Onezines. CG remembered an incident that occurred at the Onezine's house when she had been punished and put to bed in her mother's bedroom for fighting with her younger cousin. After a while, CG's mother left with Mr. and Mrs. Onezine to go to the casino, leaving CG at home with Defendant, her two younger cousins, and Defendant's elderly bedridden uncle. CG, who had been sleeping, awoke to find Defendant removing her clothes. When she began crying and asking Defendant why he was removing her clothes, he told her to

---

[2]The numbers assigned to each incident do not necessarily represent the correct chronology, which is largely indeterminate from the record.

[3]The record shows that Defendant was in prison from 1996 until mid-1999 following a probation revocation.

2

shut the "F" up. When CG kept crying and talking, Defendant became angry and covered her mouth.

After removing CG's pants and underwear, Defendant inserted his penis into her anus. Defendant kept his penis there for a while, repeatedly demanding that she shut up before he became angry, and instructed her to "get [her] stupid ass up and go in the bathroom." CG testified that, afterward, she felt as if she needed to have a bowel movement, but, when she wiped, she found that she had only passed blood. CG stated that she never told anyone what had happened because she was scared of Defendant who regularly beat her mother. CG stated that, when she asked Defendant why he had done it, Defendant told her that he did not know why.

OFFENSE NO. 3:

The next reported incident occurred after Defendant, CG, and CG's mother moved two houses down from the Onezines. Defendant picked CG up from her aunt's house, stating that CG's mother had said that it was time for her to go home. When they arrived home, CG's mother was not there. Defendant told CG to go into the bathroom to disrobe. When she left the bathroom, she found Defendant in the kitchen masturbating. Defendant instructed CG to lie down on the floor. CG again asked Defendant why, and he replied that she should not "F-in" worry about it other than to do what he said. CG laid down on the floor, and Defendant, while on top of her, repeatedly forced his penis into her vagina.

When CG cried and repeatedly told Defendant "No," he told her to be quiet, began kissing her all over, and finally demanded that she shut her "stupid ass" up. Defendant then laid down on the floor and told CG to get on top of him. When she told him that she did not want to, he pulled her down and made her sit on top of his penis. After she refused to move on top of Defendant, he became angry, forced his

3

penis into her vagina, and moved her himself. CG told him that he was hurting her, but he continued what he was doing. Defendant told her to kiss him, and again, CG refused, so he kissed her. When Defendant was finished, he made her go into the bathroom so that she could clean herself, specifically ordering her to wipe her face because he did not want people to see her with red eyes. CG testified that Defendant threatened to beat and kill her and/or her mother if she told anyone. CG did not tell anyone at that time because she was scared of Defendant.

OFFENSE NO. 4:

While still living on California Street in Lafayette, Louisiana, CG was left at home alone with Defendant. Defendant called her into his bedroom where she found him naked from the waist down. When Defendant instructed CG to suck his penis, she yelled at him that she did not want to do so because it was nasty. After Defendant threatened her, CG complied. Defendant then told her to go and wash her mouth. CG testified that she again asked Defendant why he made her do these things and that Defendant replied that he did not know, that she was stupid, and that it was her fault. CG did not report the offense because she was afraid that Defendant would beat her and her mother, whom he had previously beaten.

OFFENSE NO. 5:

Again while living on California Street in Lafayette, CG's mother left her alone with Defendant. CG was in her bedroom when Defendant entered and demanded that she remove her clothes. CG told Defendant to stop and asked him why he was doing these things, because he would always promise that each incident would be the last time. After CG disrobed, Defendant told her to open her legs, which she did. Defendant put his mouth on her vagina and asked her several times if what he was doing felt good. CG cried, told him no, and said what he was doing

4

was wrong because he was like her father. When Defendant finished, he instructed CG to wash herself.[4] Again, CG did not immediately report the crime.

OFFENSE NO. 6:

On one occasion, CG accompanied Defendant when he brought her mother to the hospital because of her blood pressure. While there, CG's brother called and asked for a ride to the hospital. CG asked to stay with her mother while Defendant picked up her brother, but Defendant refused, saying that CG's mother needed to rest. Instead of driving directly to where CG's brother was waiting for them, Defendant drove back to their house on California Street. When CG asked what they were doing at home, Defendant told her to shut up, to go into the house, and to not worry about what they were doing there.

Defendant accompanied CG into her bedroom where he instructed her to disrobe. She began to cry and asked him why. Defendant then made CG lie down on the bed. He then pulled his pants down and removed her clothes. This time, Defendant attempted, but was unable, to force his penis into CG's vagina. CG began to yell and move, but stopped when Defendant told her that he would tape her mouth if she continued. CG testified that she thought Defendant would tape her mouth and that she believed everything he said.

Defendant went into the bathroom and returned with some hair grease. After demanding that CG lie still, he rubbed the grease on both of their genitals, then repeatedly forced his penis into her vagina. Defendant's actions hurt CG, and when she screamed and yelled that he was hurting her, Defendant said that he did not care. Instead of stopping, Defendant put his hand over CG's mouth and continued to force his penis into her vagina. After CG cleaned herself in the bathroom, they left to pick

---

[4]At this point in her testimony, CG mentioned that Defendant would sometimes clean her at the conclusion of the offense.

up her brother. When they arrived, CG's brother was upset because it had been two hours since his mother had telephoned to say that Defendant and CG had left the hospital. CG testified that her brother noticed that her eyes were red and that she looked like she had been crying, so he asked CG what had happened. CG tried to tell her brother, but Defendant interrupted her and told CG to "shut up and sit the f__k down."

OFFENSE NO. 7:

On one occasion, CG was alone with Defendant in his vehicle when he parked near some trees at the Heymann Center in Lafayette, Louisiana. When Defendant told CG to get into the back seat, she exited the vehicle and tried to run away, but fell after her blouse snagged on a branch. Defendant caught up with CG, pushed her, yelled at her, and demanded to know the reason she did not get into the back seat. CG replied she was tired of "that," she was scared of him, and she was going to get some help. After Defendant responded that he had only wanted to look at her private parts, CG told him that he should not be doing that either. Defendant then cursed at her; she began to cry and they left.

OFFENSE NO. 8:

Another offense occurred when Defendant picked CG up from her aunt's house following a trail ride. Defendant had told CG that her mother had made a quick trip to the store with her grandmother, but when they arrived home, CG's mother was not there. Defendant told CG to go into her mother's room because she was going to have sex with him. She replied that she did not want to have sex with him and asked where her mother was. Defendant responded that he had lied about her mother and that CG's mother was visiting a friend.

CG testified on that particular occasion that Defendant laid her down on the

6

bed and forced his penis into her vagina. She reported that she was scared and crying. CG told him, or asked him, to stop and tried to push him off her, but he was too strong. Defendant told her that he did not know why he did these things to her, but that it was her fault. When CG asked how it was her fault, Defendant could not explain. When Defendant was through, they went into the bathroom to wash. While in the bathroom, Defendant helped her wash her face because she did not clean it well enough.

After washing, Defendant and CG went to where her mother was visiting. CG's mother noticed that her eyes were red and asked CG what was wrong. She replied that she did not feel very well. CG testified that she was too scared to tell the truth because she knew what would happen if she did.

OFFENSE NO. 9:

Another incident CG described took place in a trailer on Carmel Drive in Lafayette, Louisiana. CG accompanied her mother and Defendant to a beauty salon where her mother was having her hair done. CG wanted to stay with her mother, but Defendant said that she had to leave with him because the shop was too full. Once in the car, Defendant took CG to a trailer off the Breaux Bridge highway. At the trailer, Defendant went inside. When he found out that no one was there, he exited the trailer and sent CG inside. Defendant followed CG and told her to go to the back room and remove her clothing. CG, who realized what was happening, became frightened and ran around the trailer trying to get away. Defendant caught her when she grabbed the telephone to call for help. He unplugged the telephone and pulled CG into the back room.

Once in the back room, CG asked if she could go to the bathroom. Defendant let her go into the bathroom, but he made her leave the door open and stood in the

7

doorway to make sure that she did not escape. CG took a long time, and Defendant eventually pulled her out and forced her again into the back room. Defendant ordered her to remove her clothes, but she told him that she did not want to comply. Defendant then grabbed her, and they fell to the floor. During the struggle, CG kicked and broke some glass around a computer stored in the bedroom. Defendant told CG that she had made it worse for herself by not listening and commented that he would have to make up a lie about the computer.

Defendant then placed CG in handcuffs, which usually hung from his rearview mirror, pulled her on top of the bed, and removed her clothes. He then pulled down his pants, forced his penis into her vagina, and hurt CG by moving roughly. After awhile, Defendant brought her into the bathroom, wiped her, and told her to clean her face. CG kept asking Defendant why he had done that to her. At first, Defendant told her that he did not know why, but he then told her that she had brought it upon herself because he had initially only wanted to look at her. Again, Defendant threatened to beat both CG and her mother, if her mother found out about the incident. When they returned to the beauty parlor, CG's mother noticed that CG looked as if she had been crying and asked her what was wrong. CG testified that she did not tell her mother because she was scared of Defendant. She knew that he would beat her mother, because he had done it before, and she was afraid that he would kill her mother.

OFFENSE NO. 10:

The following offense happened after CG's family moved to North General Marshal Street, which is also in Lafayette, Louisiana. CG's sister, who is deaf, was visiting for the weekend. When CG's sister went into the bathroom to take her bath, CG wanted to accompany her, but Defendant refused to allow CG to stay with her sister in the bathroom. Instead, Defendant instructed CG to go into the back room

8

and remove her clothes. After CG complied with Defendant's instructions, he entered the room, closed the door, laid on top of her, opened her legs, and repeatedly forced his penis into her vagina. When she cried and yelled for him to stop, Defendant told her to shut up and that no one could hear her anyway.

When CG's sister finished bathing, she looked for CG and Defendant, but she did not find them. Thinking that she had been left alone, CG's sister ran outside and down the street to her godmother's house. After Defendant finished with CG, he told her to stay in the room and dress. Before going to retrieve CG's sister, Defendant threatened to beat CG if she left. Defendant told CG's sister that he and CG had been in the backyard picking up trash. Defendant ordered CG to tell her sister the same story, which she did, because she was afraid of Defendant.

CG testified that, during every offense, she told Defendant to stop, that she tried to stop him, and that she fought him. CG's police statement indicates that, when she resisted, Defendant would hold her down, choke her, cover her mouth with his hand, and threaten to tie her up and/or tape her mouth. The police report also reveals that Defendant's actions hurt CG's private parts, making them bleed when she tried to urinate. CG reported that Defendant threatened to kill both CG and her mother, including a threat to throw CG, who cannot swim, into the water. CG stated that she did not tell her mother about the abuse because she was afraid that Defendant would hurt her mother, especially if her mother confronted Defendant about his abuse. CG averred that Defendant was the only person with whom she had ever had sex.

*Second Time Reporting the Abuse:*

CG finally told her mother about the abuse on April 30, 2002.[5] The report occurred several months after Defendant and CG's mother had separated, and when

---

[5]CG's mother testified that CG told her on April 30, 2001.

9

CG and her mother were staying at a cousin's house. CG had previously confided in a cousin, but she had begged the cousin not to tell anyone. CG's mother called the Lafayette City Police and reported the abuse on May 1, 2002.[6] The officer making the initial investigation took statements from both CG and her mother. Before leaving, the officer recommended that CG's mother take her to the hospital for an examination. The officer then returned to the police department and transferred the case to a juvenile detective for further investigation. The juvenile detective observed further interviews with CG taken at a child advocacy center and found no inconsistencies when he compared the interview with her written statement.

CG's mother took her to University Medical Center on May 3, 2002. Dr. Cecelia Nervez gave CG a complete physical examination. Upon request, and without objection by the defense, the trial court qualified Dr. Nervez as an expert after learning that she had performed sexual abuse examinations for more than ten years.

When she examined CG, Dr. Nervez found three defects or v-shaped scars on her hymen, which indicated that CG was penetrated by a foreign object larger than her vaginal opening. Dr. Nervez testified that the injuries were consistent with CG's story, and inconsistent with a straddle injury. Dr. Nervez stated that normal scarring disappears within three to five weeks; however, more severe lacerations can leave scars for up to a year, although a lot of the scars will disappear within two to three months. The more severe lacerations are usually characterized by bleeding, which CG's medical chart indicated had occurred. Dr. Nervez did not perform a DNA test because the last reported incident had occurred between five and ten months prior to the exam. Defendant contested CG's accusations at trial by stating that he had never

---

[6]CG's mother testified that she and CG reported the abuse to the police on May 1, 2001.

10

been alone with her and that he rarely ever lived with her mother during their marriage. Instead, Defendant alleged that he usually co-habitated with a succession of several girlfriends. Defense witnesses testified in support of Defendant's claim, stating that they had never seen CG alone with Defendant. However, CG's mother testified that she would leave Defendant alone with CG whenever she had to run errands or went out with friends. CG's brother, along with several other family members, confirmed that CG had spent time alone with Defendant. At least two family members noticed that CG did not want to be alone with Defendant.

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, this court notes that there is an error patent with the sentence imposed. However, as discussed below, this issue is not properly before the court.

The trial court found Defendant guilty of forcible rape and aggravated incest, but imposed only one sentence of forty years at hard labor. Additionally, the trial court did not state on which offense the sentence was being imposed. Thus, the trial court imposed an indeterminate sentence, which this court would normally vacate and remand for re-sentencing. However, the indeterminate sentence was vacated when Defendant was adjudicated a habitual offender. Since the original sentence was vacated and a new sentence imposed, any errors with the original sentence are moot and present nothing for this court to review.

According to the minutes, the trial court adjudicated Defendant a habitual offender and sentenced Defendant to a single sentence of fifty years at hard labor, without benefit of probation, parole, or suspension of sentence. Although this court can vacate a habitual offender sentence, in this matter, the habitual offender docket

11

number is not before the court. Even though the habitual offender bill is not in the present record, the minutes of the habitual offender adjudication and sentencing indicate that the habitual offender bill was filed under docket number 103,337. The only docket number contained in Defendant's motion for appeal is docket number 100,826, the docket number for the underlying convictions of forcible rape and aggravated incest.[7] Defendant was not adjudicated and sentenced as a habitual offender until March 14, 2005, which was after he filed his motion for appeal on January 18, 2005. No motion for appeal was filed in the trial court in docket number 103,337, and no notice of appeal has been filed with this court under the habitual offender docket number. Accordingly, the habitual offender docket number is not before this court for review.

### ASSIGNMENT OF ERROR NO. 1:

Defendant contends that there was insufficient evidence to prove beyond a reasonable doubt that he committed forcible rape.[8] In determining sufficiency of the evidence on appeal, this court has previously stated:

---

[7]At the original sentencing hearing, the State cited docket number 98,994 as the docket number under which Defendant was being sentenced for the underlying convictions of forcible rape and aggravated incest. In its brief, the State asserts that the reference to docket number 98,994 was a mistake, as the charges filed under that docket number had been dismissed, and as the minutes and sentencing transcript reflect, Defendant was clearly sentenced originally under docker number 100,826. The trial transcript mistakenly refers to docket number 100,286. However, this court did confirm that the charges filed in docket number 98,994 had been dismissed on November 20, 2003.

In its brief, the State explains that Defendant was originally charged by bill of information in docket number 98,994 with one count of forcible rape and one count of aggravated incest. The same facts, however, were later presented to the Grand Jury for review, and Defendant was indicted with one count of forcible rape and one count of aggravated incest. The Grand Jury indictment received docket number 100,826. The State dismissed the 98,994 charges on November 20, 2003.

[8]Defendant's brief also alleges that the State refused to answer Defendant's two motions seeking a bill of particulars, but he does not assign this as a formal assignment of error. Defendant contends that, had the State provided a bill of particulars, he may have been able to provide an alibi. The State responds that the Lafayette Parish District Attorney's office has an open file discovery policy, which allows the defense attorney the opportunity to review all information contained in the prosecution file, including police reports. Thus, Defendant had access to all information held by the prosecution and the filing of a formal bill of particulars was unnecessary.

12

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King,* 436 So.2d 559 (La.1983); *State v. Duncan,* 420 So.2d 1105 (La.1982); *State v. Moody,* 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See King,* 436 So.2d 559, citing *State v. Richardson,* 425 So.2d 1228 (La.1983).

In order for the State to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt. In order for this court to affirm a conviction, the record must reflect that the State has satisfied this burden of proving the elements of the crime beyond a reasonable doubt. *State v. Kennerson,* 96-1518 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367.

*State v. Touchet,* 04-1027, pp. 1-2 (La.App. 3 Cir. 3/9/05), 897 So.2d 900, 902, citing

*State v. Lambert,* 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27. "A

victim's or eyewitness's testimony alone is usually sufficient to support a verdict."

*State v. Harris,* 01-2730, p.41 (La. 1/19/05), 892 So.2d 1238, 1261 citing, *State v.*

*Davis,* 02-1043, p.4 (La. 6/27/03), 848 So.2d 557, 559; *State v. Hills,* 99-1750, p.8

n. 8 (La. 5/16/00), 761 So.2d 516, 522 n. 8.

Defendant argues that CG's testimony should be discounted because CG and

her mother had a motive to fabricate the alleged acts, because CG could not remember

the day, month, or season in which the last alleged incident occurred, and because she

could not remember the specific date or a reasonable time frame for any of the

incidents. According to its duty, the trial court weighed the respective credibility of

witnesses and found the witnesses for the prosecution to be more credible than

Defendant. As previously decided by both this court and the supreme court, this court

should not now second-guess the district court's credibility determination. *Touchet,*

897 So.2d at 902.

13

Defendant primarily argues that the physical evidence was inconsistent with CG's testimony because the hymen scars would have already disappeared if the acts occurred within the described time frame. In support of his argument, Defendant points out that Dr. Nervez testified that long-lasting scars on the hymen would be characterized by bleeding and that CG's testimony only stated that she bled anally. Although CG's testimony only describes anal bleeding, the prosecution also, without objection from the defense, introduced CG's written police statement into evidence. The written statement reveals that Defendant would hurt CG's "stuff" during intercourse, causing her to bleed when she went to the bathroom. CG stated explicitly that, when she tried to urinate, it would hurt and red matter would "come down." Therefore, contrary to Defendant's argument, there was evidence presented at trial sufficient to indicate vaginal bleeding. Furthermore, Dr. Nervez, whom the court qualified as an expert without objection by Defendant, confirmed that her findings were consistent with CG's story, which reported that the last encounter with Defendant had been between July and December of 2001 and that some bleeding had occurred.

CG testified in detail about offenses occurring after Defendant returned from prison until December 2001  According to Defendant's testimony, he was released from prison on May 5, 1999. From the time Defendant was released from prison until August 15, 2001, La.R.S. 14:41 provided:

> A.    Rape is the act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.

> B.    Emission is not necessary and any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime.

1990 La. Acts No. 722, § 1. Beginning August 15, 2001, the scope of La.R.S. 14:41 expanded to provide a remedy for oral intercourse:

14

A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.

B. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime.

C. For purposes of this Subpart, "oral sexual intercourse" means the intentional engaging in any of the following acts with another person:

(1) The touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender.

(2) The touching of the anus or genitals of the offender by the victim using the mouth or tongue of the victim.

2001 La. Acts No. 301, § 1.

From the time Defendant was released from prison until August 15, 2001,

La.R.S. 14:42.1 (A)( 1) provided, in pertinent part:

A. Forcible rape is rape committed when the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:

(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

1997 La. Acts No. 862, § 1. After August 15, 2001, the scope of La.R.S. 14:42.1(A)

(1) was also broadened to provide a remedy for forced oral intercourse:

A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:

(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

2001 La. Acts No. 301, § 1.

Because there are no specific dates assigned to the described offenses, this

15

court will examine the sufficiency of the evidence insofar as it pertains to the incidents that occurred after Defendant's return from prison under the earlier, more restrictive, statutes.

The Louisiana Supreme Court has held that a defendant's conduct in applying force to the victim's person, despite her cries for help and her active resistance, is sufficient to prove use of force in a prosecution for forcible rape. *State v. Richardson,* 425 So.2d 1228 (La.1983); *State v. Turnbull,* 377 So.2d 72 (La.1979). CG testified that, on each occasion, she resisted Defendant both by fighting him and telling him to stop. Her written police statement indicates that Defendant would counter CG's resistance by holding her down, choking her, covering her mouth, and threatening to tie her up or tape her mouth. Thus, there is evidence in the record to show that, when there was anal or vaginal penetration, the intercourse was nonconsensual because CG was prevented from resisting each offense both by force and threats of physical violence. La.R.S. 14:41; La.R.S. 14:42.1.

Additionally, several of the events detailed by CG include descriptions of vaginal or anal penetration when Defendant forced his penis into either her vagina or anus. In describing offense no. 2, CG testified that there was anal penetration. In recalling offense no. 3, she testified that there was vaginal penetration when, in spite of her resistance, Defendant pulled her down on top of him, positioned her, and manually moved her. Offense no. 6 involved vaginal penetration after Defendant countered CG's verbal and physical resistance when he removed her clothing, made her lie down, threatened to tape her mouth, and covered her mouth with his hand. Offense no. 8 included vaginal penetration in spite of CG's verbal resistance and physical efforts to push Defendant away. Vaginal penetration also occurred in offense no. 9 after Defendant grabbed CG, forced her into a room, struggled with her

16

when she refused to remove her clothing, handcuffed her, and removed her clothes. In offense no. 10, Defendant repeatedly inserted his penis into CG's vagina even though she verbally resisted his actions.

Therefore, the record shows that, on several occasions, Defendant engaged in nonconsensual vaginal or anal intercourse with CG and that the intercourse was nonconsensual because Defendant countered CG's resistance by the use of force or threats of physical violence. La.R.S. 14:41; La.R.S. 14:42.1. Thus, there was sufficient evidence presented at trial to prove beyond a reasonable doubt that Defendant committed at least one count of forcible rape.

Accordingly, this assignment of error is without merit.

### ASSIGNMENT OF ERROR NO. 2:

Defendant asserts that, under La.Code Crim.P. art. 611 and *State v. Richardson,* 35,450 (La.App. 2 Cir. 2/27/02), 811 So.2d 154, the State must prove venue at trial in order for his conviction to stand. Defendant maintains that nothing in the trial transcript establishes the jurisdiction of the trial court and that, although the record refers to street addresses, it contains nothing to indicate that any of the places were either in Lafayette Parish or in the City of Lafayette.

Contrary to Defendant's assertion, both this court and the supreme court have previously held that, under La.Code Crim.P. art. 615,[9] a defendant cannot raise venue as an issue on appeal when he did not first raise the issue by motion to quash prior to trial. *State v. Clark,* 02-1463 (La. 6/27/03), 851 So.2d 1055, *cert. denied,* 540 U.S. 1190, 124 S.Ct. 1433 (2004); *State v. Fontenot,* 95-459 (La.App. 3 Cir. 11/2/95), 664

---

[9]Louisiana Code of Criminal Procedure Article 615 provides:

> Improper venue shall be raised in advance of trial by motion to quash, and shall be tried by the judge alone. Venue shall not be considered an essential element to be proven by the state at trial, rather it shall be a jurisdictional matter to be proven by the state by a preponderance of the evidence and decided by the court in advance of trial.

So.2d 523, *writ granted on other grounds,* 95-2920 (La. 3/22/96), 669 So.2d 1229, *affirmed in part, reversed in part,* 95-2920 (La. 5/31/96), 675 So.2d 271. In the instant case, Defendant did not file a motion to quash his indictment alleging improper venue. Because Defendant did not first raise venue as an issue prior to trial, he waived any right to assert improper venue on appeal.

Therefore, this assignment of error is without merit.

### ASSIGNMENT OF ERROR NO. 3:

Defendant argues that the trial court erred in transferring his case from one section to another because it did not allow a hearing as provided in La. Dist. Ct. R. 14.3. Defendant maintains that La. Dist. Ct. R. 14.3 requires a hearing to be held if all parties have not given written consent. Defendant states that the motion does not contain a certificate showing service on the defense attorney, that no hearing was held on the motion, and that the trial court signed an *ex parte* order granting the motion without first requiring the State to show good cause for the transfer. Defendant asserts that, because of this error, this court should reverse his conviction or vacate his conviction and sentence and remand his case to the trial court.

The State responds that the case was transferred from one criminal track to another criminal track without any objection made by Defendant. The prosecution points out that the transfer was performed because of the dates of the offenses. The State further asserts that the transfer only affected which clerk would handle the file, and which Assistant District Attorney would handle the prosecution, because the Fifteenth Judicial District Court rotates its judges. The State asks this court to consider any objection to the transfer as being waived because Defendant did not object when the transfer occurred, and because Defendant did not allege any prejudice.

18

Louisiana District Court Rule 14.3 provides the procedure for transferring an allotted case:

> Any case that has been allotted may be transferred from one division to another division for good cause, or by written consent of all parties, including the state, the defense and the court. Consent transfers must be by written order signed by both the transferring judge and the receiving judge.

> If all parties do not consent, a show cause hearing shall be held, the burden to show good cause upon the moving party. The hearing shall be before a judge ad hoc, selected in the manner set forth for motions to recuse under Louisiana Code of Criminal Procedure Article 675.

La. Dist. Ct. R. 14.3.

The record shows that, on November 12, 2003, the State filed a motion to transfer case, requesting that Defendant's case be transferred from Track 3 to Track 4. On the same date, Judge Thomas Frederick granted the motion. The motion does not state reasons for the requested transfer, the record does not contain any information indicating that the defense filed a written consent to the transfer, and the order is only signed by one judge. Thus, the transfer was not accomplished in strict compliance with La. Dist. Ct. R. 14.3.

However, this court has previously applied the harmless error analysis in determining whether a conviction should be overturned based on a transfer made after the initial allotment. *State v. Prudhomme,* 99-2029 (La.App. 3 Cir. 6/5/02), 819 So.2d 443, *writ denied,* 02-2073 (La. 6/27/03), 847 So.2d 1251, citing La.Code Crim.P. art. 921; *State v. Humphrey,* 412 So.2d 507 (La.1981). "A reversal and a new trial is required only if there is a reasonable possibility that the error complained of might have contributed to the conviction." *Prudhomme,* 819 So.2d at 451, citing *State v. Hocum,* 456 So.2d 602 (La.1984). "The defendant must show prejudice before his conviction will be reversed." *Id.,* citing *State v. Sweeney,* 443 So.2d 522 (La.1983);

19

*State v. Romero,* 552 So.2d 45 (La.App. 3 Cir. 1989), *writ denied,* 559 So.2d 137 (La.1990).

Therefore, because Defendant does not allege that any prejudice resulted from the transfer, this assignment of error is without merit.

### ASSIGNMENT OF ERROR NO. 4:

Defendant urges that the trial court improperly sentenced him under docket number 98,994, when his bill of indictment bears docket number 100,826.

During the October 11, 2004 sentencing hearing, there was some confusion as to which was the appropriate docket number. Initially, the State mentioned that Defendant was being sentenced under docket number 103,337, which is the docket number assigned to Defendant's habitual offender bill. Defendant then mentioned that he had been convicted under docket number 100,826. The prosecution agreed that it had stated the wrong docket number and twice restated the docket number as 98,994, which was the docket number on the initial charging instrument in the current matter.[10] However, the record shows that, in spite of the confusion during the hearing, the sentence issued on October 11, 2004 has been attributed to docket number 100,826, which is the trial court docket number of the instant case. Both the minutes of court for October 11, 2004 and the cover sheet of the sentencing transcript list the accurate docket number. Therefore, the sentence was appropriately assigned to Defendant's conviction despite the confusion regarding the docket number at the hearing. Additionally, any discrepancy in the docket number assigned to the October 11, 2004 sentence is now moot because the sentence was subsequently vacated after the district court found Defendant to be a habitual offender.

Thus, this assignment of error is without merit.

---

[10]The initial charging instrument was a bill of information that was dismissed on November 20, 2003 after a grand jury issued a bill of indictment charging Defendant with the same crimes.

20

**ASSIGNMENT OF ERROR NO. 5:**

Defendant claims that the sentence imposed for his convictions is excessive for both the offender and the offense. He contends that the trial court did not give sufficient weight to the mitigating factors presented at the time of sentencing. Defendant argues that, in mitigation, his prior criminal history does not include this type of offense, he has completed classes for his violent tendencies in the past, and, as an auto mechanic accustomed to working two jobs, he is capable of supporting himself and his family. Defendant further maintains that a forty-year sentence serves no useful purpose and constitutes a needless infliction of pain and suffering.

Defendant was sentenced to serve forty years at hard labor on October 11, 2004. However, Defendant was subsequently adjudicated to be a habitual offender on March 14, 2005. After finding Defendant to be a multiple offender, the district court vacated Defendant's forty-year sentence and imposed a new sentence under the habitual offender docket number 103,337. Thus, because Defendant's forty-year sentence no longer exists, this issue is moot. *See State v. Pitre,* 04-1134 (La.App. 3 Cir. 2/9/05), 893 So.2d 1009.

Therefore, this assignment of error is without merit.

**ASSIGNMENT OF ERROR NO. 6:**

Defendant maintains that the record is insufficient to adjudicate him as a habitual offender. Defendant points out that the minutes of court for March 14, 2005 is the only entry in the record regarding his habitual offender hearing. Defendant complains that the minutes of court do not indicate that a hearing took place or that there was conclusive proof of any findings of fact sufficient to show that Defendant was convicted of other felonies.

Defendant's motion for appeal, filed on January 18, 2005, lists the docket

number of the appeal as 100,826. Defendant did not move for appeal of his habitual offender proceeding because his motion for appeal was filed several months prior to the habitual offender proceeding, which was filed under a separate docket number. Thus, Defendant's appeal does not include docket number 103,337, and the issue is not properly before this court.

Accordingly, this assignment of error is without merit.

## **DECREE**

For the foregoing reasons, we affirm Defendant's convictions.

**AFFIRMED.**