STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-915

STATE OF LOUISIANA

VERSUS

DAVID BOURG

**********

ON APPLICATION FOR SUPERVISORY WRITS FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. 2014-2706
HONORABLE H. WARD FONTENOT, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Elizabeth A. Pickett, and Phyllis M. Keaty, Judges.

**WRIT GRANTED; ORDER GRANTING NEW TRIAL REVERSED; REMANDED TO TRIAL COURT FOR SENTENCING.**

H. Todd Nesom
District Attorney – 33rd Judicial District Court
Joe Green
Assistant District Attorney – 33rd Judicial District Court
P. O. Box 839
Oberlin, LA 70655
Telephone: (337) 639-2641
COUNSEL FOR:
    Plaintiff/Applicant - State of Louisiana

Chad Guidry
P. O. Box 447
Kinder, LA 70648
Telephone: (337) 738-2280
COUNSEL FOR:
    Defendant/Respondent - David Bourg

**THIBODEAUX, Chief Judge.**

The State of Louisiana (State) filed a writ application for supervisory review of the trial court's ruling granting the defendant, David Bourg, a new trial following the jury's verdict that the defendant was guilty of manslaughter. We docketed the State's writ application for full briefing and argument. Upon review, we find that the trial court legally erred and abused its discretion in granting the defendant a new trial. Accordingly, we grant the State's writ application and reverse the ruling of the trial court. We remand this case to the trial court for sentencing of the defendant in accordance with the manslaughter statute, La.R.S. 14:31.

## I.

## ISSUE

We must decide whether the trial court erred in granting the defendant's motion for new trial on the grounds that the State failed to prove specific intent beyond a reasonable doubt.

## II.

## FACTS AND PROCEDURAL HISTORY

On June 1, 2014, David Bourg drove Michael Pitre home from target practice. While parked in front of Pitre's mother's house, Bourg shot Pitre in the head with Bourg's nine millimeter Ruger handgun, killing Pitre. Pitre did not have a gun. The bullet entered Pitre's left temple and exited above and behind his right ear. Pitre slumped forward in the passenger seat. The blood from Pitre's head wound soaked the right edge of the passenger seat in Bourg's truck and ran into the

passenger door sill. Bourg immediately lit a cigarette and paced outside his truck with his still-loaded gun and cell phone in hand, attempting repeatedly to call his sister, his sister's boyfriend, and his brother. He did not attend to Pitre or call 911. Pitre's brother and his mother heard the shot from Pitre's mother's house and went outside. Pitre's brother saw the gun and sent his mother back inside. She called 911. Pitre's brother asked Bourg repeatedly to put the gun down so he could lend assistance to his brother.

Police officers arrived, as did Pitre's son and daughter-in-law, who began CPR. Bourg put the gun to his own head. Officer Frank Restivo arrived first and heard Bourg say, "I will kill myself" and "I will kill ya'll." Officer Restivo and Officer Matthew Hebert ordered Bourg to throw the weapon down at least ten times. Bourg ultimately de-cocked the gun and threw it on the ground. Officer Restivo saw Bourg look toward the weapon again, and he ran at Bourg and tackled him to the ground, briefly, or almost, rendering him unconscious. Officer Restivo is six feet five inches tall and weighs 280 pounds. Bourg's head and back hit the pavement hard, and his body bounced. Dr. Jude Agendia treated Bourg at Kinder Hospital and noted ecchymosis around the eye, which is bleeding or draining under the skin. Dr. Christopher Tape testified that Bourg's ecchymosis[1] around the eyes was consistent with his head hitting the pavement very hard.

When asked why he shot Pitre, Bourg told the arresting chief of police, Grady Haynes, that Pitre threw his laptop or iPad out of the window. An Allen Parish Grand Jury charged David Bourg with the second-degree murder of Michael Pitre, a violation of La.R.S. 14:30.1. Two years later, a jury convicted

---

[1]Dr. Tape explained that ecchymosis occurs when blood drains away from the area of contact and settles somewhere else.

Bourg, eleven to one, of the responsive verdict of manslaughter, a violation of La.R.S. 14:31.

Defense counsel filed a "Motion for New Trial and/or Motion for Post-Verdict Judgment Granting Acquittal." The defendant sought the acquittal pursuant to La.Code Crim.P. art. 821, asserting that there had been insufficient evidence to support his conviction. He requested a new trial pursuant to La.Code Crim.P. art. 851(B)(1) and (5), arguing that the verdict was contrary to the law and evidence and that the ends of justice would be served by the granting of a new trial.

At the hearing on the motions, the defense requested either a new trial or an entry of a post-verdict judgment of "negligent homicide." The trial court denied the motion for a post-verdict judgment but granted the motion for a new trial. The State filed an application for supervisory review by this court.

The State contends that there are issues of law and a showing of an abuse of discretion, which warrant review and are within this court's jurisdiction. We granted the State's application for supervisory review and now find that the trial court erred as a matter of law on the issue of specific intent and upon the granting of a new trial.

III.

**LAW AND DISCUSSION**

The trial for second degree murder lasted six days and ended in June 2016, with a jury's verdict convicting the defendant of manslaughter. Second degree murder is punishable by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La.R.S. 14:30.1(B). Manslaughter is

3

punishable by imprisonment at hard labor for zero to forty years. La.R.S. 14:31(B).

At the end of the trial, the jury was instructed to find the defendant "guilty" based upon a finding of the elements of second degree murder, as charged, or the responsive verdict of manslaughter, or the responsive verdict of negligent homicide; or, if the jury found justification such as self-defense, it was to find the defendant "not guilty." The jury was given the elements of each offense.

Second degree murder was defined to the jury as "the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm." *See* La.R.S. 14:30.1(A)(1). Manslaughter was defined as "the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." *See* La.R.S. 14:31(A)(1).

Negligent homicide was defined as the killing of a human being by criminal negligence, which exists when there is "such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under similar circumstances." *See* La.R.S. 14:32. The jury was further instructed on the definitions of justified homicide and self-defense. The jury returned a verdict of "guilty of manslaughter."

### *Hearing on the Defendant's Motions*

The hearing on the defendant's motion for a post-verdict judgment of either acquittal, or of negligent homicide, or for a new trial, was held three months

after the June verdict, in September 2016. It appears that the trial transcript had not yet been prepared and that the trial court did not have the trial testimony for review on the motions. At the beginning of the hearing, Mr. Bourg's attorney stated, "we are relying completely on the evidence not being sufficient" for the conviction. He very briefly argued, "I think the evidence was clear that there was a fight. I think he was protecting himself and that he didn't intend to kill Mr. Pitre." The State's attorney briefly argued the lack of evidence of a fight and the fact that the defendant shot Mr. Pitre in the head because Mr. Pitre threw his laptop out of the window. He pointed out the absence of any injuries on Mr. Pitre's hands indicating that he had punched Bourg repeatedly, as Bourg claimed. He also pointed out the undisturbed nature of the items in the truck, indicating that no fight took place. This was essentially all of the argument that was presented.

After discussing the evidence in a light favorable to the *defendant*, the trial court set aside the jury's verdict of manslaughter, finding that the State had failed to provide sufficient evidence, proof beyond a reasonable doubt, of the "critical" element of "specific intent." The trial court stated:

> Considering that the burden is on the State to prove every element of a crime beyond a reasonable doubt, and that the specific intent required of this crime is one of those elements, it is the finding of the Court that the forensic evidence creates more than a doubt on the critical question of specific intent.

### *Specific Intent*

Specific intent is ultimately a legal conclusion to be resolved by the trier of fact. *State v. Graham*, 420 So.2d 1126 (La.1982); *State v. Lewis*, 525 So.2d 215 (La.App. 1 Cir.), *writ denied*, 531 So.2d 469 (La.1988). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the

offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1); *State v. Lindsey*, 543 So.2d 886 (La.1989), *cert. denied*, *Lindsey v. Louisiana*, 494 U.S. 1074, 110 S.Ct. 1796 (1990). Specific intent can be formed in an instant. *State v. Harris*, 01-2730 (La. 1/19/05), 892 So.2d 1238, *cert. denied*, *Harris v. Louisiana*, 546 U.S. 848, 126 S.Ct. 102 (2005); *State v. Cousan*, 94-2503 (La. 11/25/96), 684 So.2d 382. Specific intent need not be proved as fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. *State v. Graham*, 420 So.2d 1126.

The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. *State v. Seals*, 95-0305 (La. 11/25/96), 684 So.2d 368, *cert. denied*, *Seals v. Louisiana*, 520 U.S. 1199, 117 S.Ct. 1558 (1997). The defendant does not dispute that his gun was the only weapon in the truck or that he pulled the trigger and fired the bullet that killed Michael Pitre. While not evident in his words or actions at the scene of the crime, Mr. Bourg argued at trial that the gun discharged accidentally while he was defending himself against the victim and trying to use it as a bludgeoning device. But the jury heard much testimony and saw photographic evidence that contradicted the defendant's assertions.

### *Sufficiency of the Evidence and Standard of Review*

In reviewing the sufficiency of the evidence, an appellate court must determine that the direct and/or circumstantial evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proved beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Neal*, 00-674 (La.

6

6/29/01), 796 So.2d 649, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002). This is a question of legal sufficiency of the evidence. *State v. Combs*, 600 So.2d 751 (La.App. 2 Cir.), *writ denied*, 604 So.2d 973 (La.1992). This standard of review is applicable to the trial court as well. *See Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970 (1981). Here, where the trial court found the evidence insufficient but did not view the evidence in the light most favorable to the prosecution, as required by *Jackson,* there was error of law, and the motion must be reconsidered. *State v. Chapman*, 438 So.2d 1319 (La.App. 3 Cir. 1983).

The trial court began its comments making reference to the State's theory, but not discussing the State's evidence, on second degree murder:

> The State is not required to prove a motive for a killing. But in the face of the confusing evidence or lack thereof regarding what did transpire in the truck, the State sought to flesh out a theory of specific intent based on anger toward the decedent. This was grounded on defendant's own testimony and earlier statements to law enforcement that as he and the decedent were approaching their final destination the decedent threw an iPad or a laptop or similar device out of the truck. The State contended that this act enraged the defendant to the point that he reached into the space between the console and his seat, pulled the pistol, and shot the decedent once in the head. The defendant dismissed the idea that he could have been so angry about the loss of the device.

Next the trial court made various comments that were contrary to the defendant's own testimony and the evidence at trial:

> While his denials on the stand can be explained as self-serving testimony, it is true that there is no indication in any of the evidence of the trial that the defendant had a violent or explosive disposition. While it is not part of the trial evidence the Pre-Sentence Report does not contradict that conclusion. The defendant's criminal record is devoid of any felonies or even misdemeanors, violent or otherwise.

The defendant himself admitted at trial that he had been "ticketed" for fighting, or disturbing the peace, decades before this incident. The record contains a printout showing that David Bourg had four previous arrests before this shooting: an arrest in Allen, Louisiana, in 1989 for disturbing the peace (fight); another arrest in Allen for disturbing the peace in 1991; an arrest in Lafayette in 1992 for refusing to move on; and an arrest in Lafayette in 2004 for a traffic violation. The victim, on the other hand, was revealed to have thrown one single punch in a bar many years before this incident. The only witness called by the defendant at trial was the man who received that punch, Bon Manuel. Mr. Manuel testified that while playing pool with Mr. Pitre, Mr. Pitre punched him once, and that was it— nothing more.

The trial court next discussed the defendant's version of the shooting, omitting crucial details in the record that were part of the State's evidence:

> The version of events based on defendant's testimony develop a different picture. He testified that it was the decedent who had become inexplicably angry, evidenced by the tossing of the iPad or the electronic device. The defendant had brought his truck to a stop in front of decedent's mother's home, where the decedent was staying at the time, when suddenly and without apparent reason the decedent began hitting the defendant full in the face. The defendant does not deny that he pulled the gun from its holster, but claimed that he was trying to use it as a club in self-protection. When pressed by the Assistant District Attorney about whether he meant to fire the weapon or whether it went off accidently the defendant's responses were generally that owing to the excitement and bizarre circumstances of the moment he did not know.

The trial court did not discuss the State's evidence at all, much less in a light favorable to the State. For example, part of the referenced "bizarre circumstances" were created by the fact that both men had been drinking quite a bit

8

of beer on the day and evening of the shooting. However, the defendant also admitted to having taken the prescription drugs Xanax, Oxycodone, and Roxicodone. Several members of Mr. Pitre's family testified that Mr. Pitre had a drinking problem and usually drank until he passed out, often having to be helped from someone's vehicle or helped into bed after falling asleep at the kitchen table. However, testimony revealed that he was never aggressive; he was always home by dark; he did not have a vehicle or a driver's license; and he worked at a nursing home a few blocks from his mother's house, as well as doing maintenance work on rent houses in the neighborhood. The testimony overwhelmingly shows that the victim often helped his friends with handyman tasks including plumbing, tinting glass, and working underneath houses where others could not; and those folks would pick him up and bring him home from these projects.

Evidence further showed that there were no drugs in Mr. Pitre's system when he died, but his blood alcohol level was over two times higher than Mr. Bourg's (.383 for Mr. Pitre and .123 for Mr. Bourg). Dr. Tape, who performed the autopsy, testified that intoxication at the level of Mr. Pitre's would have resulted in impaired motor skills, lack of coordination, decreased level of consciousness, and could have caused blurry vision among other effects.

The jury also heard evidence that Mr. Bourg was five feet eleven inches tall and weighed 210 pounds, while Mr. Pitre was five feet seven inches tall and weighed 166 pounds. The jury heard Mr. Pitre's brother, Brett Pate, testify that when he was finally allowed to go to the truck to get his brother, he physically picked him up and "cradled" him in his arms to carry him into his mother's yard. The jury also saw close-up photographs of Mr. Pitre's hands taken, as a matter of professional habit, by Dr. Christopher Tape who conducted the autopsy. There

were no scrapes, contusions, broken skin or bruises on Mr. Pitre's hands or his knuckles, even though Mr. Bourg testified that Mr. Pitre had hit him in the face with his fists seven times. While not discussed at all by the trial court, a rational jury could have concluded, in light of all this evidence, that Mr. Pitre was not a reasonable threat to Mr. Bourg and that Mr. Bourg's assertions were not borne out by the evidence.

Finally, the trial court discussed the evidence regarding the trajectory of the bullet in a light favorable to the defendant, further omitting crucial details, and misconstruing the defendant's own testimony:

> [T]he trajectory of the bullet, which was established by x-rays, physical probes, and expert testimony, supplies the key. If the State's version is accepted the weapon would have been aimed at a seated Michael Pitre and the trajectory of the bullet would have been somewhat horizontal unless its path was diverted by some force or object, which was not indicated, the bullet would have ended up hitting the window or at least the door on the passenger side. But that is not where the spent projectile was found. It was located in the roof of the cab, nearly centrally located. Integrating this irrefutable physical evidence defendant's testimony that decedent had aggressively attacked him and was beating on him is supported by the location of the spent cartridge. It indicates that the shot was fired upward toward an assailant. This means that Michael Pitre was out of his seat and was atop the defendant at the moment that the shot was fired. This is also consistent with the medical testimony of the path of the projectile as it entered and exited the decedent's skull.

The trial court's summary is contrary to the testimony and the evidence at trial. Mr. Bourg himself testified that Mr. Pitre was not on top of him when the gun was fired. The trial judge said that since there was some blood on the passenger's side of the console, the top of Mr. Pitre's head was probably as far as the midline of the console at the time he was shot. Mr. Bourg also testified that

10

he got the gun out of the holster and held it back behind the seat, which indicates that, if Mr. Pitre did reach for the gun, Mr. Bourg had it safely away from Mr. Pitre but chose to bring it back around to the front again. Additionally, the bullet was not centrally located in the roof of the truck; nor did the location of the spent cartridge support an attack by the victim. The photographs showed the bullet hole located in the ceiling toward the passenger door. Crime Scene Investigator Chris Oakes found the spent shell casing on a towel in the middle of the back seat. He testified that it had been ejected to the right when the gun was fired. Although Detective Oakes could not tell the exact angle of the weapon when it was fired, he testified that the gun was fired from the driver's side of the truck toward the passenger side; the gun was pointed up, and the bullet hole was off toward the passenger side of the vehicle. Detective Oakes further testified that he tested the gun and that the trigger had to be pulled in order for it to fire. When fired, the gun ejected the spent bullet casing to the right.

The jury further heard Mr. Pitre's brother, Brett Pate, testify that when he opened the passenger door of the truck, his brother was sitting in the center of the passenger seat of the truck, slumped forward, his hands on his legs, palms open and facing inward. Had the victim been attacking the defendant and received the gun shot to the head while over the defendant, he would have slumped over the defendant and bled on him and the driver's seat of the truck.

The jury heard Detective Chris Oakes testify that the only blood inside the truck was on the passenger seat and passenger side of the console. Likewise, the jury saw photographs of the interior of the truck with blood only on the passenger's side, with a blood-soaked passenger seat, but soaked only on the right edge of the passenger seat and dripping into the right door sill. All of

Detective Oakes's testimony, as well as the defendant's own testimony, support the conclusion that Mr. Pitre was on the passenger side of the vehicle when he was shot, not on top of the defendant as concluded by the trial court.

The jury also heard the defendant's own testimony showing that he took deliberate actions that a rational juror could have seen as forming the specific intent to shoot the victim, if not kill him. The defendant admitted that the holster had a strap that had to be unsnapped before the gun could be removed. While the defendant testified that Mr. Pitre reached for the gun, the defendant not only admitted to pulling it from its holster between the driver's seat and the driver's side of the console; he admitted to taking the extra step of unsnapping the strap that kept the gun secured inside the holster:

> Q. Okay. So, while he is hitting at you, you pushed him back.
>
> A. I pushed him back and I pushed his right hand away and I grabbed the gun with my right.
>
> Q. You grabbed the gun with your right hand.
>
> A. Yes.
>
> Q. Okay. And you had to pull it out of the holster?
>
> A. Yes.
>
> Q. How did you unstrap that? With what hand did you unstrap it?
>
> A. With my thumb.

If Mr. Bourg had wanted to get away from Mr. Pitre and protect himself, he could have grabbed the entire holster and thrown it out the driver's side window or door, and gotten out of the truck. A rational juror could easily have found that Mr. Bourg formed the specific intent to shoot the victim when he

reached down by his seat, unlatched the strap of the holster, pulled the gun from its holster, held it by its stock, not by its barrel, and placed his finger on the trigger. Mr. Bourg himself testified that in order for the gun to fire, the trigger had to be pulled:

> Q. For that particular gun, you said that it was not cocked. So, you had to pull the trigger for it to fire, correct?
>
> A. Correct. Even if it was cocked you would have to pull the trigger for it to fire.

The jury also heard Mr. Bourg testify that he thought it was necessary to kill Mr. Pitre at the time; however, he later tried to retract any admission of intent:

> Q. Do you believe it was necessary to kill Michael Pitre.
>
> A. To protect myself at that point, yes.
>
> Q. So, you intentionally shot –
>
> A. I didn't intentionally shoot him, no.
>
> Q. So, was this self-defense or was this an accident?
>
> A. It was a combination of both because I was trying to protect myself when the gun accidently went off. I didn't mean to pull the trigger. You know, it is hard to say, it just happened.

In addition to evidence that Mr. Pitre was too drunk and too small to harm Mr. Bourg, the jury heard testimony from witnesses who saw Mr. Bourg immediately after he exited the truck, and none of them noticed any disabling limitations or any injuries indicating that he had been attacked.[2] Wesley Pitre, Mr. Pitre's son who lived two doors from his grandmother, testified that when he

---

[2]Mr. Bourg testified that he was injured at work in the 1990's, had had two back surgeries, and had been on disability and not worked since the injury.

arrived at the scene, the defendant was walking around in circles, with no problems walking. Brett Pate testified that the defendant smoked a cigarette and paced around after exiting the truck with no trouble walking, no appearance of pain, and no injuries to his face. When officers arrived, they noticed the same things. From fifteen feet away, Officer Frank Restivo saw no injuries on Mr. Bourg, no difficulty walking, and he was not acting as if he were in pain. Officer Matthew Hebert confirmed that he saw no injuries to the defendant upon his arrival. The only evidence of an injury to Mr. Bourg prior to Officer Restivo's tackle was Mr. Bourg's verbal complaint of a chipped tooth and some blood on a cigarette found at the scene. The photographs taken after Mr. Bourg's arrest show only a very light smudge of blood in the center of the front of his t-shirt. The jury heard repeated testimony indicating that Mr. Bourg's injuries were the result of being tackled by the six-foot-five-inch, 280-pound Officer Restivo, who hit him with all of his force, such that Officer Hebert saw his body bounce off of the asphalt after hitting it.

Other testimony included Oberlin Chief of Police Grady Haynes, who arrived at the scene and was told that Mr. Bourg wanted to see him:

A. And once he was subdued I stayed with the subject, and they [other officers] went to the yard.

Q. Okay. And what did you do then?

A. Just stayed with the subject and tried to listen to what was going on. But I talked to the subject.

Q. Okay. And what did he say?

A. Well, I asked him, who did he shoot. And he said Mike.

Q. Uh huh (yes).

A. And I asked him, I said, well, why did you do that. He said, because he threw a laptop out of the window.

Q. Did he say anything else?

A. I asked him, I say, well, that is not worth shooting anybody over, you know. And he told me he tried to kill himself. And that he wasn't worth living for.

Q. So, Mr. Bourg said he, Mr. Bourg, tried to kill himself.

A. Yeah.

Q. Okay. Did he say anything else to you?

A. That was it.

Q. Did he say that Mike was trying to or Mike had been hitting him, punching him, anything that?

A. Nothing at all. That was the last thing he said to me.

Q. Did he ever say Mike had the gun, tried to get my gun, --

A. No.

Q. - - anything like that?

A. No, sir.

Q. So, he said, he threw my laptop and that was it?

A. Uh huh (yes).

Even though the defendant now denies the above statements and argues that the shooting was in self-defense and accidental, the jury's verdict of manslaughter demonstrates that the jury accepted the testimony of the State's twenty-six witnesses, found intent and provocation in the defendant's words and actions immediately following the shooting, and rejected the defendant's trial version of the shooting. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. *See State v. Johnson*, 99-385

15

(La.App. 1 Cir. 11/5/99), 745 So.2d 217, *writ denied*, 00-829 (La. 11/13/00), 774 So.2d 971. After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the evidence proved manslaughter beyond a reasonable doubt.

We further note that if the trial court had used the proper *Jackson* standard and viewed the evidence in the light most favorable to the prosecution and still found the evidence not sufficient to prove specific intent beyond a reasonable doubt, the court would have been required to acquit the defendant on his motion for post-verdict judgment of acquittal, due to the prohibition against double jeopardy. *See Hudson v. Louisiana*, 450 U.S. 40; *State v. Voorhies*, 590 So.2d 776 (La.App. 3 Cir. 1991).

### *Improper Standard and Analysis in Granting New Trial*

The defendant argues that the trial court granted his motion for a new trial based upon a finding that the jury's verdict was "contrary to the law and the evidence," which is a statement that the trial court made following its analysis of insufficient evidence to support the conviction on the element of intent. The defendant argues that the granting of a new trial on the basis that the verdict was contrary to the law and evidence is unreviewable under *State v. Guillory*, 10-1231 (La. 10/8/10), 45 So.3d 612. This is a reference to La.Code Crim.P. art. 858, which states that appellate jurisdiction cannot be invoked to review the granting or the refusal to grant a new trial in criminal cases, "except for error of law." Per *Guillory*, legal questions and legal errors are always reviewable.

16

As shown above, however, the trial court's entire analysis was on insufficient evidence of specific intent; the court used the wrong standard for that inquiry as well, and it came to the wrong conclusion; i.e., that the evidence was insufficient to prove intent beyond a reasonable doubt. Just because the trial court stated at the end of its analysis that the verdict was "contrary to the law and the evidence," which uses a different standard and a different analysis, without applying the proper standard and the proper analysis, does not remove a legal error or supply an omitted analysis. As succinctly stated by the fifth circuit:

> Pursuant to [La.Code] Cr.P. art. 851, the motion for new trial is based upon the supposition that an injustice has been done to the defendant, and unless such injustice is shown, the new trial motion shall be denied no matter upon what allegations the motion is grounded. In a motion for new trial, the trial judge can only review the weight of the evidence and as such make a factual review as a "thirteenth juror," rather than under the sufficiency of evidence standard enunciated in *Jackson v. Virginia*[.]

*State v. Badeaux*, 01-618, p. 6 (La.App. 5 Cir. 11/27/01), 802 So.2d 905, 908, *writ denied*, 01-3403 (La. 10/4/02), 826 So.2d 1121.

### Weight of the Evidence

As illustrated above, the trial court did not consider the *weight* of the evidence on both sides. It discussed a very small portion of the evidence, the trajectory of the bullet, in a light favorable only to the defendant; and it misstated the evidence on that issue. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the *weight* of the evidence, not its sufficiency. *State v. Allen*, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, and 02-2997 (La. 6/27/03), 847 So.2d 1255,

17

*cert. denied*, *Allen v. Louisiana*, 540 U.S. 1185, 124 S.Ct. 1404 (2004). The trial court did not discuss or re-weigh conflicting testimony.

The "'weight of the evidence refers to a determination by the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.'" *State v. Jeanlouis*, 96-474, p. 9 (La.App. 3 Cir. 11/6/96), 683 So.2d 1355, 1361 (quoting *Tibbs v. Florida*, 457 U.S. 31, 37, 102 S.Ct. 2211, 2216 (1982)), *writ denied,* 96-2822 (La. 4/18/97), 692 So.2d 446. Likewise, the trial court did not discuss a greater amount of credible evidence on either side. In failing to weigh the evidence introduced by both the defendant and the prosecution, or reweigh the evidence as a thirteenth juror sitting as the trier of fact, the trial court again applied the wrong standard for determining whether a new trial should be granted. In so doing the trial court committed legal error and an abuse of discretion. Accordingly, the new trial should not have been granted.

IV.

**CONCLUSION**

Based upon the foregoing, we reverse the trial court's ruling granting the defendant's motion for a new trial. We remand this case to the trial court for the sentencing of Mr. Bourg according to the jury's verdict of manslaughter under La.R.S. 14:31.

**WRIT GRANTED; ORDER GRANTING NEW TRIAL REVERSED; REMANDED TO TRIAL COURT FOR SENTENCING.**